Michael E. Zeliger (CA Bar No. 271118)
michael.zeliger@pillsburylaw.com
Steven Tepera (TX Bar No. 24053510)
steven.tepera@pillsburylaw.com
Jon Jekel (CA Bar No. 298646)
jon.jekel@pillsburylaw.com
Ryan Sullivan (TX Bar No. 24102548)
ryan.sullivan@pillsburylaw.com
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
401 West 4th Street, Suite 3200
Austin, TX 78701
512.580.9600
(*pro hac vice applications forthcoming*)


Kenneth R. Davis, II, OSB No. 971132
daviskr@ballardspahr.com
Mohammed N. Workicho, OSB No. 186140
workichom@ballardspahr.com
**BALLARD SPAHR LLP**
601 S.W. Second Avenue, Suite 2100
Portland, Oregon 97204
Telephone: 503.778.2100
Facsimile: 503.778.2200


*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| TEXAS PRECIOUS METALS, LLC, | Case No.: _____ |
| Plaintiff, | **COMPLAINT FOR:** |
| v. | (1) Registered Trademark Infringement, 15 U.S.C. § 1114; |
| VALAURUM, INC., | (2) Trademark Counterfeiting, 15 U.S.C. §§ 1116(d), 1117(b); |
| Defendant. | (3) Unregistered Trademark Infringement / False Association, 15 U.S.C. § 1125(a)(1)(A); |
| | (4) Common Law Trademark Infringement and Unfair Competition; |
| | (5) Secondary Trademark Infringement |
| | (6) Breach of Contract; and |

(7) Breach of the Implied Duty of Good Faith and
Fair Dealing

**DEMAND FOR JURY TRIAL**

Plaintiff Texas Precious Metals, LLC ("**Texas Precious Metals**"), by and through undersigned counsel, brings this action against Defendant Valaurum, Inc. ("**Defendant**") and alleges as follows:

## I.    INTRODUCTION

1.      Texas Precious Metals is a precious-metals business that owns federally registered, Texas-themed trademarks, which it uses in connection with minted bullion and related goods and services. A central, source-identifying feature of Texas Precious Metals' brand is its distinctive Texas-silhouette design, which is widely recognized and relied upon by consumers in the precious-metals marketplace.

2.      Defendant is a manufacturer of gold-note products. In 2025, Defendant entered into an agreement with Texas Precious Metals and third-party Goldback, Inc. to produce gold note products that Texas Precious Metals would market and sell. As a material term of that agreement, Defendant expressly acknowledged that Texas Precious Metals owns specified trademarks, and it agreed that it "will not" manufacture or sell any other competing product that "displays, includes, or incorporates" any mark "identical to, or confusingly similar to" such trademarks.

3.      Despite those contractual commitments, Defendant entered into an agreement with a third party where it agreed to design, manufacture, and distribute products featuring the same registered trademarks that Defendant had explicitly agreed were owned by Texas Precious Metals (the "**Unlicensed Products**"), which directly compete with, and are marketed to the same customers as, the products that Defendant simultaneously manufactured for Texas Precious Metals. Texas Precious Metals alerted Defendant of this infringement.

4.      While the Unlicensed Products infringe several of Texas Precious Metals' valuable trademarks, of particular concern was the fact that they prominently featured the Texas-silhouette "mint mark" used by Texas Precious Metals to authenticate its products. A mint mark is a small

COMPLAINT                                                    2

designation used across a range of a dealer's privately minted precious metals products to indicate their source, purity, and authenticity. As with any respected dealer's mint mark, the mint mark utilized by Texas Precious Metals is relied upon by customers as an indicator of the high quality, source, and authenticity of the product at issue.

5.     In pre-suit communications, Texas Precious Metals informed Defendant of its mint mark and objected to the unauthorized use of it on the initial versions of the Unlicensed Products. Recognizing the importance of the mint mark, Defendant removed one use of that mark on the Unlicensed Products. However, Defendant continued to display the mint mark in another location on the Products and refused to remove the remaining infringing design elements, thereby continuing its unauthorized use.

6.     Texas Precious Metals attempted to negotiate in good faith to allow Defendant to produce the infringing Unlicensed Products for a reasonable license fee. Defendant flatly refused, claiming there was no trademark infringement and that, contrary to the plain language of the parties' agreement, it never agreed that it could not use trademarks that it expressly acknowledged were solely owned by Texas Precious Metals. Defendant thereafter manufactured and distributed Unlicensed Products marketed as "Modern Texas Redback" notes featuring unauthorized uses of those same federally registered trademarks and other protected design elements uniquely and unmistakably associated with Texas Precious Metals in a manner that is not only likely to cause confusion as to source, affiliation, sponsorship, or endorsement, but is also in direct breach of Defendant's contract with Texas Precious Metals.

7.     As set forth below, Texas Precious Metals seeks injunctive relief, damages, and other appropriate relief for trademark infringement, unfair competition, and breach of contract.

## II.    JURISDICTION AND VENUE

8.     This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) and 15 U.S.C. § 1121(a) over the federal-law claims because this action arises under the Trademark Act of 1946, as amended (the "**Lanham Act**"), 15 U.S.C. §§ 1051 *et seq*. The Court has supplemental jurisdiction over the related state-law claims, including the contract claim, pursuant

to 28 U.S.C. § 1367 because those claims are so related to the federal claims that they form part of the same case or controversy.

9.      This Court also has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship and the amount in controversy exceeds $75,000, exclusive of interest and costs. Texas Precious Metals is a citizen of Texas, where its members are domiciled. Defendant is a Delaware corporation with its principal place of business in Oregon and is therefore a citizen of Delaware and Oregon. The amount in controversy, including claimed damages, Defendant's profits, injunctive relief, and other equitable relief sought, exceeds the jurisdictional threshold.

10.     This Court has personal jurisdiction over Defendant because Defendant is subject to general and specific jurisdiction in Oregon. Defendant maintains its principal place of business in Portland, Oregon. Defendant also purposefully directed the acts complained of to this District and committed material acts in this District, including by designing, developing, manufacturing, supplying, marketing, or distributing the Unlicensed Products from within this District. The claims arise out of or relate to those forum-based contacts, and the exercise of jurisdiction is reasonable and comports with due process.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1)–(2) because Defendant resides in this District and a substantial part of the events or omissions giving rise to the claims occurred here, including the design, manufacture, supply, and related conduct giving rise to the infringement and contractual breaches alleged in this Complaint. Venue is also proper because Texas Precious Metals and Defendant are parties to a September 23, 2025 Sales Agreement containing a mandatory forum-selection clause requiring that actions arising under or relating to the agreement be brought exclusively in courts located in Multnomah County, Oregon, including the federal courts located therein, and Defendant waived any objection to jurisdiction or venue and any claim of inconvenient forum.

12.     Divisional venue is proper in the Portland Division because Defendant's principal place of business and operations are located in Multnomah County, Oregon, and a substantial part of the conduct giving rise to the claims occurred in and around Portland, Oregon.

### III.   THE PARTIES

13.     Texas Precious Metals is a Texas limited liability company with its principal place of business located at 959 Hwy 95N, Shiner, Texas 77984.

14.     Defendant is a Delaware corporation with its principal place of business located at 1355 NW Everett St., Suite 100, Portland, Oregon 97209.

### IV.   FACTUAL BACKGROUND

**A.     Texas is Fundamental to the History and Brand of Texas Precious Metals**

15.     Texas Precious Metals is a subsidiary of Kaspar Companies, a 128-year old, fifth-generation family business in Shiner, Texas with deep Texas roots. Its longstanding connections to the State of Texas have been the heart of its business for decades.

16.     Since its inception, Texas Precious Metals has become a leader in the precious metals industry; having processed over $4 billion in client transactions and shipped more than 200,000 orders to all 50 states. As one example of its industry leadership, in 2025 Texas Precious Metals became an Affiliate Member of the London Bullion Market Association (the "**LBMA**"). The LBMA is the leading global trade association for the precious metals industry. Among other things, the LBMA sets the benchmark spot prices for precious metals that are used by financial institutions and industry participants worldwide.

17.     For more than 15 years, Texas Precious Metals has marketed and sold precious-metals products and related services under a family of distinctive, Texas-themed trademarks and service marks. Through its longstanding history in the State of Texas and its production and distribution of precious-metals within the state, customers have come to associate the Texas-themed marks as a unique source identifier for Texas Precious Metals products.

COMPLAINT                    5

18.    Texas Precious Metals has actively cultivated and reinforced the association that consumers draw between the company and its Texas-themed trademarks and has taken extensive efforts to preserve the integrity and distinctiveness of those Texas-themed trademarks. This has generated a suite of protectable Texas marks, many of which are the subject of incontestable federal trademark registrations, which are invaluable to Texas Precious Metals and serve as critical indicators to consumers to identify the source and quality of its precious-metals products.

19.    At the core of Texas Precious Metals' branding is a series of marks featuring a silhouette of the State of Texas (the "**Silhouette Mark**"), which functions as a central source identifier for Texas Precious Metals' products and appears as follows:



20.    Texas Precious Metals uses the Silhouette Mark as its "mint mark"—a small letter, symbol, or inscription on precious metal products indicating their source, purity, and authenticity—on products such as silver bars and non-legal tender medallions (referred to as "rounds"). The Silhouette Mark consistently appears in this capacity across Texas Precious Metals' product line. For example, below are two Texas Precious Metals rounds with the Silhouette Mark as the mint mark, followed by a zoomed-in excerpt of the first image to emphasize the mint mark:






21.     The Silhouette Mark is the subject of three active federal trademark registrations owned by Texas Precious Metals. Two are registered on the Principal Register and are incontestable: U.S. Reg. No. 5,113,004 in Class 14 (for "precious metals; non-monetary coins, namely, rounds; and bullion") and U.S. Reg. No. 5,113,005 in Class 35 (for "online retail store featuring gold and silver and other rare metals, coins, and bullion"). The third has been registered on the Supplemental Register since September 2013: U.S. Reg. No. 4,404,997 in Class 35 (for "online retail store featuring gold and silver and other rare materials, coins of others, and bullion").

22.     Texas Precious Metals has continuously used the Silhouette Mark in commerce throughout the United States since at least 2013 in connection with its precious metals business.

23.     Texas Precious Metals also owns additional federal trademark registrations relevant to this action, including: (a) registrations for marks that combine the Silhouette Mark with additional wording or graphics (the "**Composite Marks**"); (b) registrations depicting the Texas State Capitol (the "**Capitol Marks**"); and (c) a registration depicting the Texas State Capitol rotunda (the "**Rotunda Mark**"). One Composite Mark shows a star overlaid on a silhouette of the State of Texas. The Capitol Marks show oblique angles of the Texas State Capitol. The Rotunda Mark shows the interior of the rotunda of the Texas State Capitol at an orthogonal view, resulting in a centered star bearing the letters "T", "E", "X", "A", and "S" between its points within a concentric pattern:

| Composite Marks | Registered Goods/Services | Status |
|---|---|---|
| ![TEXAS PRECIOUS METALS]<br><br>U.S. Reg. No. 5,076,058 | Class 35: Online retail store featuring gold and silver and other rare metals, coins of others and bullion | Registered on the Principal Register as of November 8, 2016<br><br>Incontestable |

| | | |
|---|---|---|
| <br><br>U.S. Reg. No. 6,358,058 | <u>Class 39</u>: Storage services, namely, the physical storage of art work, documents, jewelry, and personal goods | Registered on the Supplemental Register as of May 18, 2021 |
| **Capitol Marks** | **Registered Goods/Services** | **Status** |
| U.S. Reg. No. 4,788,152 | <u>Class 14</u>: Non-monetary coins | Registered on the Principal Register as of August 11, 2015<br><br>Incontestable |
| U.S. Reg. No. 6,031,097 | <u>Class 14</u>: Precious metals; non-monetary coins, namely, rounds; silver bullion, and gold bullion | Registered on the Supplemental Register as of April 7, 2020 |
| U.S. Reg. No. 6,031,098 | <u>Class 14</u>: Precious metals; non-monetary coins, namely, rounds; silver bullion, and gold bullion | Registered on the Supplemental Register as of April 7, 2020 |
| **Rotunda Mark** | **Registered Goods/Services** | **Status** |
| | <u>Class 14</u>: Precious metals; silver bullion, and gold bullion | Registered on the Supplemental Register as of April 7, 2020 |

| U.S. Reg. No. 6,031,099 |
| --- |

(together with Reg. Nos. 4,404,997, 5,113,004, and 5,113,005, the "**TPM Registered Marks**").

24.     In addition to the TPM Registered Marks, Texas Precious Metals owns valuable common-law (unregistered) trademark rights in marks that include or consist of the word "TEXAS" or Texas-themed imagery—either (a) variations of marks that are the subject of the above federal registrations; or (b) those same marks when used in connection with goods or services beyond the scope of the federal registrations—arising from Texas Precious Metals' longstanding, continuous, and exclusive use of those marks in commerce (the "**TPM Common Law Marks**," and together with the TPM Registered Marks, the "**TPM Marks**").

25.     The TPM Common Law Marks are inherently distinctive or have acquired distinctiveness among relevant consumers through the continuous and exclusive use of those marks by Texas Precious Metals in commerce.

26.     The TPM Marks constitute a cohesive family of marks united by common elements and a shared Texas theme, which consumers recognize as designating a single source—Texas Precious Metals.

27.     One of Texas Precious Metals' signature products is a series of "rounds"—an industry term for privately minted, non-legal tender medallions resembling a coin, made with either gold or silver—bearing Texas-themed imagery (known as "**Texas Rounds**"). These products are widely distributed and prominently marketed by Texas Precious Metals. For example, below is an image of both sides of the 2024 Gold Texas Round.

 

28.     As depicted above, the front of the 2024 Texas Round features one of the Composite Marks that is the subject of an incontestable federal trademark registration (U.S. Reg. No. 4,788,152), consisting of the Silhouette Mark, a lone star design, and the wording "TEXAS PRECIOUS METALS," and the backside consists of one of the Capitol Marks that is also the subject of a federal trademark registration (U.S. Reg. No. 6,031,098).

29.     Another category of products sold by Texas Precious Metals is silver and gold bars. For example, below are images of its Texas Mint Silver Bars, which display the Rotunda Mark and the Silhouette Mark on one side, and multiple reproductions of the Silhouette Mark on the other side.

 

30.     The signature gold and silver Texas Rounds, as well as the Texas Silhouette mint mark, are at the heart of the nationwide brand recognition and popularity for Texas Precious Metals and serve as key source identifiers for its precious-metals products.

31.     Texas Precious Metals also prominently features the TPM Marks on its product packaging, including the following packaging bearing the Silhouette Mark and the Rotunda Mark, thereby reinforcing consumer recognition of the TPM Marks as indicators of source and quality:

COMPLAINT                                    10

 

32.     As a result of the widespread, continuous, and exclusive use of the TPM Marks to identify Texas Precious Metals and its products and services, Texas Precious Metals owns valid and subsisting federal statutory and common law rights in and to the TPM Marks.

33.     Each of the TPM Marks is distinctive to both the consuming public and within the industry in which Texas Precious Metals operates. Texas Precious Metals has expended substantial time, money, and resources marketing, advertising, and promoting the services and products sold under the TPM Marks. As a result, the TPM Marks have come to signify the high quality of the products and services designated by those marks and have acquired substantial distinction, reputation, and goodwill belonging exclusively to Texas Precious Metals. Consumers associate the TPM Marks uniquely and exclusively with Texas Precious Metals as the source of those products and services.

**B.     Defendant Contracts with Texas Precious Metals and Agrees that Certain Registered Trademarks are the Sole and Exclusive Properties of Texas Precious Metals**

34.     Defendant contracted with Texas Precious Metals regarding the design, manufacture, and distribution of certain products. As a material term of the contract, Defendant agreed that certain registered trademarks listed in the contract are valid and owned by Texas Precious Metals, and it promised to refrain from using such trademarks in a manner that would harm Texas Precious Metals, its trademarks, or the goodwill extending therefrom. These contracts were executed at the highest level at Defendant, with signatures from its president himself. Despite these promises, as described below, Defendant has repeatedly breached the applicable contract and violated Texas Precious Metals' valuable trademark rights.

35.     In the summer of 2025, the CEO of third-party Goldback, Inc. ("**GBI**") contacted Texas Precious Metals regarding the possibility of Texas Precious Metals becoming an official distributor of GBI's "Goldback" products—proprietary, fungible, negotiable instruments infused with varying amounts of 24-karat gold. These products represented a new and emerging category within the precious metals industry, combining physical gold content with features more commonly associated with currency and negotiable instruments and distinct from traditional bullion formats. Because of the newness and unfamiliarity of these products to the consuming public, consumers' reliance on the reputation of the underlying source—through source identifiers such as trademarks—as an assurance of quality, purity, and value, is particularly important.

36.     At the same time, Texas Precious Metals and GBI also agreed to collaborate on the development of a Texas-themed Goldback product (the "**Gold Note**"), which would apply this novel product format to a Texas-branded design intended for sale to Texas Precious Metals' customer base and to leverage Texas Precious Metals' established brand recognition.

37.     GBI proposed that Defendant serve as the manufacturer of the Gold Note, representing that Defendant possessed a specialized and proprietary manufacturing process uniquely suited to producing these new, gold-infused negotiable instruments.

38.     In 2025, Texas Precious Metals, GBI, and Defendant entered into a series of agreements governing the development, manufacture, distribution, and sale of Texas-identified Gold Note products and, critically, the permitted scope of any use of the TPM Marks, including the Silhouette Mark, with the express intent of protecting Texas Precious Metals' trademark rights and goodwill.

39.     Relevant here, Texas Precious Metals, GBI, and Defendant entered into a three-party Sales Agreement dated September 23, 2025 (the "**Sales Agreement**") to establish the contractual framework under which Defendant would manufacture and sell covered products to GBI under accepted purchase orders, while also establishing express protections for trademarks owned by Texas Precious Metals—including the Silhouette Mark—against any use by Defendant outside of the contract. *See* **Exhibit 1** (the Sales Agreement).

COMPLAINT                                    12

40.    Pursuant to the Sales Agreement, Texas Precious Metals granted Defendant a limited, non-exclusive, and expressly conditioned license to reproduce, display, include, or incorporate certain Texas Precious Metals-created trademarks, images, designs, and other elements, including what the Sales Agreement refers to as the "TPM Trademarks," which are defined to include the following federal trademark registrations:

    a.    U.S. Reg. No. 4788152 (the Composite Mark on the 2024 Gold Round);

    b.    U.S. Reg. No. 5113004 (an incontestable Silhouette Mark registration);

    c.    U.S. Reg. Nos. 6031097 and 6031098 (the Capitol Marks); and

    d.    U.S. Reg. No. 6031099 (the Rotunda Mark).

*Id.* at 6, 16.

41.    In Section 13(b) of the Sales Agreement, Defendant expressly acknowledged that the "TPM Trademarks" are the "sole and exclusive properties" of Texas Precious Metals. *Id.* at 6–7. Defendant further covenanted that it "will never make, cause others to make, or assist others in making any claim whatsoever to ownership of . . . the TPM Trademarks," and confirmed that "all goodwill resulting from the use of the TPM Trademarks shall inure to the benefit of [Texas Precious Metals]." *Id.* These acknowledgments were unqualified and unequivocal.

42.    Section 13(b) further provides that Defendant "will not design, develop, manufacture, market, distribute, or sell any product . . . that displays, includes, or incorporates any mark or symbol that is identical to, or confusingly similar to, any TPM Trademark when such mark or symbol is used as a source identifier, brand name, logo, or in any other manner that would constitute use of a TPM Trademark or create a likelihood of confusion, mistake, or deception as to the affiliation of [Defendant's product] with, or the sponsorship or endorsement of [Defendant's product] by, [Texas Precious Metals]." *Id.* This prohibition applies regardless of whether the product is made for Texas Precious Metals or for any third party. In relevant part, the Sales Agreement states:

(b) Seller acknowledges and agrees that (i) the federal trademark registrations identified on Exhibit C attached hereto (the "TPM Trademarks") are the sole and

exclusive properties of TPM, (ii) Seller will not design, develop, manufacture, market, distribute, or sell any product (a "Seller Product") that displays, includes, or incorporates any mark or symbol that is identical to, or confusingly similar to, any TPM Trademark when such mark or symbol is used as a source identifier, brand name, logo, or in any other manner that would constitute use of a TPM Trademark or create a likelihood of confusion, mistake, or deception as to the affiliation of the Seller Product with, or the sponsorship or endorsement of the Seller Product by, TPM, and Seller will not sell, ship, or otherwise dispose of any Product except in accordance with a Purchase Order hereunder, (iii) Seller will never make, cause others to make, or assist others in making any claim whatsoever to ownership of or (except for the rights granted by TPM to Seller under, and during the term of, this Agreement) rights in any or all of the TPM Trademarks in connection with the manufacture, advertising, promotion, sale, or distribution of any product, and (iv) all goodwill resulting from the use of the TPM Trademarks shall inure to the benefit of TPM.

*Id.*

43.     The Sales Agreement includes an equitable-relief clause in Section 20(i), in which Defendant acknowledged and agreed that "there would be no adequate remedy at law for its breach of Section 13(b)" and that, "in the event of such breach, [Texas Precious Metals] will be entitled to equitable relief by way of temporary, preliminary, and permanent injunction . . . without proof of any actual or special damages and without the need to post any bond." *Id.* at 12. Defendant thus expressly agreed that injunctive relief would be appropriate and necessary in the event of trademark-related breaches, as set forth below:

> Equitable Relief. Seller acknowledges and admits that there would be no adequate remedy at law for its breach of Section 13(b) of this Agreement. Seller agrees that, in the event of such breach, TPM will be entitled to equitable relief by way of temporary, preliminary, and permanent injunction, and further equitable relief as any court of competent jurisdiction may deem just and proper, without proof of any actual or special damages and without the need to post any bond.

*Id.*

44.     The Sales Agreement further provides, in Section 20(g), that Delaware law governs, and it includes a mandatory forum-selection provision providing that the state and federal courts located in Multnomah County, Oregon have jurisdiction and venue over disputes "under or relating to" the Sales Agreement. *Id.* at 11. Defendant expressly consented to such jurisdiction and venue, and the parties waived jurisdictional and venue defenses and any claim of inconvenient forum. *Id.*

COMPLAINT                                    14

**C.**     **Defendant's Unlicensed Products Featuring the TPM Marks**

45.     In the fourth quarter of 2025, Texas Precious Metals and Defendant discussed Defendant's agreement to manufacture the Unlicensed Products, which are sold by United States Gold Bureau ("**USGB**"), a direct competitor of Texas Precious Metals. Defendant disclosed that it was manufacturing the new gold note products for Texas Precious Metals and the Unlicensed Products at the same time, positioning the products to compete directly with one another in the same emerging segment of the precious metals industry. Like the products being manufactured for Texas Precious Metals, the design of the Unlicensed Products heavily focused on Texas themes and was explicitly for the manufacture and distribution of precious metals in note form intended for sale to overlapping customers.

46.     Texas Precious Metals initially learned of a potential design for an Unlicensed Product, shown below in one variation, that Defendant was preparing to manufacture and distribute through USGB.



47.     Texas Precious Metals informed Defendant of numerous infringing elements on the above and other similar notes, including that they featured:

        a.     Obvious and repeated Texas themes on a product in the same field of use covered by the TPM Registered Marks that would directly compete with Texas Precious Metals' own Gold Note products;

b.    The signature Silhouette Mark in the top left corner in a red-orange color nearly identical to the color used by Texas Precious Metals;

c.    An additional Texas-silhouette mint mark beneath the "Texas Bullion Depositoy.gov" label;

d.    A third replication of the Silhouette Mark as a watermark in the left half of the note;

e.    A star with "T", "E", "X", "A", and "S" between the points, with a concentric circular pattern within the center of the star design, which incorporates the Rotunda Mark; and

f.    A star superimposed on a Texas silhouette.

48.    Defendant agreed that the marks were problematic. On November 3, 2025, Defendant exercised its design discretion on the product and agreed to remove the Texas Silhouette in the top left corner. However, it refused to act on any of the other trademark infringement, claiming that it was trying to balance its client's design preferences with legal obligations to other parties. Defendant claimed that its client "has its own priorities for design which must be balanced and managed." *See* **Exhibit 2** (correspondence from J. Creedon to R. Dewan dated Nov. 3, 2025). Defendant claimed it was "under pressure to begin manufacture" of the Unlicensed Products. *Id*. Defendant thus acknowledged the infringing elements while electing to proceed with manufacturing the Unlicensed Products for a competitor of Texas Precious Metals.

49.    On November 4, 2025, Texas Precious Metals informed Defendant that despite any so-called "priorities for design" stated by its client, those "priorities" did not override Texas Precious Metals' trademark rights. *See* **Exhibit 3** (correspondence from R. Dewan to J. Creedon dated Nov. 4, 2025). Defendant cannot simply ignore trademark law because its client insists on it. Nevertheless, Texas Precious Metals attempted to reach an amicable solution and proposed that Defendant simply license the marks at issue for this purpose. *Id.* Texas Precious Metals proposed a president-to-president conversation to resolve the issue efficiently and avoid litigation. *Id*.

COMPLAINT                                    16

50.     The principals conversed, and on November 6, 2025, Defendant provided Texas Precious Metals with a mockup of a modified note. *See* **Exhibit 4** (correspondence from A. Trexler to T. Saab dated Nov. 6, 2025). The mockup removed the small Texas Silhouette from the top-left corner and replaced it with a star, but otherwise retained the disputed design elements.



51.     The note did not remove the many trademark infringements apparent throughout the design and discussed by the principals in their call. Instead, Defendant stated that the image should be considered "locked": "[T]he art (main images) and design features could be considered locked for the purposes of [Defendant's and Texas Precious Metals'] discussion." *Id*. With that single and relatively minor change to remove one instance of Silhouette Mark, Defendant indicated it "wish[ed] to proceed with production." *Id*.  In an attempt to cabin the infringement to notes only, Defendant stated that it would be willing to agree that if it were to create coins for its client, it would insist that none of the trademarked images be on the coins. *Id*. At the moment, the offer is meaningless, given that Defendant does not mint coins. *Id*.

52.     Texas Precious Metals again proposed a reasonable licensing arrangement to allow Defendant to produce the notes without infringing Texas Precious Metals' registered and common law trademark rights, and Defendant flatly refused to pay ***any*** amount, claiming financial difficulty: "Given the already thin margins on our product, we cannot consider a licensing fee." *See* **Exhibit 5** (correspondence from A. Trexler to T. Saab dated Nov. 17, 2025). Despite rejecting a licensing arrangement and making no other commercially reasonable offer, Defendant attempted to secure a "letter documenting a legal review . . . for both parties to indicate that the [Unlicensed Products] do not violate a trademark." *Id*. This zero-dollar offer and proposed written agreement that there was no violation was couched as an "amicable middle ground." *Id*.

COMPLAINT                                    17

53.    Texas Precious Metals, of course, did not agree. Instead, it pointed out that not only were there violations of trademark rights, but that the conduct breached the contract between the two parties as well, which gave Texas Precious Metals protection ***even broader*** than trademark rights. The Sales Agreement's prohibition applies to any product and to any manner of use of the TPM Trademarks, not merely to use that functions as a source identifier, stating in relevant part:

> (b) Seller acknowledges and agrees that (i) the federal trademark registrations identified on Exhibit C attached hereto (the "TPM Trademarks") are the sole and exclusive properties of TPM, (ii) **Seller will not design, develop, manufacture, market, distribute, or sell any product (a "Seller Product")** that displays, includes, or incorporates any mark or symbol that is identical to, or confusingly similar to, any TPM Trademark when such mark or symbol is used as a source identifier, brand name, logo, or **in any other manner that would constitute use of a TPM Trademark** or create a likelihood of confusion, mistake, or deception as to the affiliation of the Seller Product with, or the sponsorship or endorsement of the Seller Product by, TPM, and Seller will not sell, ship, or otherwise dispose of any Product except in accordance with a Purchase Order hereunder, (iii) Seller will never make, cause others to make, or assist others in making any claim whatsoever to ownership of or (except for the rights granted by TPM to Seller under, and during the term of, this Agreement) rights in any or all of the TPM Trademarks in connection with the manufacture, advertising, promotion, sale, or distribution of any product, and (iv) all goodwill resulting from the use of the TPM Trademarks shall inure to the benefit of TPM.

*See* **Exhibit 1** at 6–7 (emphasis added).

54.    As noted in the language above, the Defendant agreed it would not sell "any product" that "displays, includes, or incorporates any mark" "in any [] manner that would constitute use of a TPM Trademark."  This clause is notably broad. It is repeatedly stated in the disjunctive throughout to capture any variety of conduct, which was plainly intended to bar all uses of the TPM Trademarks on any product. This disjunctive phrasing includes descriptions of the different purposes for using Texas Precious Metals' trademarks: Defendant agreed it would not use "TPM Trademarks" regardless of whether they were used on the Defendant's product "as a source identifier, brand name, logo **or** in any other manner that would constitute use of a TPM Trademark **or** create a likelihood of confusion" (emphasis added).

55.     Despite this broad language, Defendant incredibly asserted it had the opposite effect and was to be read narrowly. On January 12, 2026, Defendant wrote Texas Precious Metals and claimed the agreement "prohibits *only* use of TPM's marks 'as a source identifier' or in a way that would otherwise create a likelihood of confusion." *See* **Exhibit 6** (correspondence from J. Creedon to R. Dewan dated Jan. 12, 2026) (emphasis added). Defendant claimed that its use of the TPM Marks (or substantially similar variations thereof) was merely "ornamental" or "decorative." *See id.*

56.     Defendant's letter asserts, in effect, that the clause is simply an exercise in redundancy by restating the law of trademarks. The letter makes no effort to explain (and conspicuously omits) the broadening language that bars Defendant's use of the TPM Marks "in any [] manner."

57.     Defendant is incorrect. The Sales Agreement is not an exercise in redundancy. Instead, it is a carefully negotiated agreement unambiguously stating that Defendant would not "use" "in any [] manner" Texas Precious Metals' marks. This contract language independently restricts Defendant's conduct beyond the baseline trademark standard and creates contractual liability for any prohibited use. As such, while Defendant's use of the TPM Marks constitutes trademark infringement, it also constitutes breach of contract under the more lenient standards created by the Sales Agreement.

58.     Despite the objections from Texas Precious Metals, Defendant proceeded with production of the Unlicensed Products, which purport to be precious metal products shaped into a note design. As advertised, the notes "[c]ontain purse 24k gold measured in centigrams," which are "premium materials."

59.     The Modern Texas Redback notes are promoted with "Related Products," including precious-metal rounds manufactured by a third party, Scottsdale Mint, LLLP ("**Scottsdale Mint**"). The Scottsdale Mint rounds also infringe registered trademarks owned by Texas Precious Metals and are the subject of a separate trademark infringement lawsuit that Texas Precious Metals recently filed against Scottsdale Mint. The below is an excerpt from one such website promoting

the Unlicensed Products, indicating that the notes are sold in the same channels of commerce as other precious metal products, including coins or rounds.[1]



60.    The claims against Defendant focus on at least three specific Unlicensed Products marketed as "Modern Texas Redback" notes (the "**Redback Notes**"), in three denominations.

## **Modern Texas Redback 5 cg Gold Note**



61.    The "Modern Texas Redback 5 cg Gold Note" prominently features Texas Precious Metals' mint mark of the silhouette of Texas, it includes the Silhouette Mark in an apparent watermark fashion and includes other Texas-themed design elements that are identical or

---

[1] https://www.texasbulliondepository.gov/modern-texas-redback-20-cg-gold-note (last accessed Jan. 21, 2026).

confusingly similar to the TPM Marks. Defendant also incorporated the Rotunda Mark into the design, which appears within the prominent star in the center of the note.

**Modern Texas Redback 20 cg Gold Note**

 

62.    The "Modern Texas Redback 20 cg Gold Note" likewise displays multiple design elements that are identical or confusingly similar to the TPM Registered Marks, including imagery depicting or incorporating the Capitol Marks and the Rotunda Mark on one side and Texas-themed logo elements (including the Silhouette Mark and mint mark) on the reverse.

**Modern Texas Redback 100 cg Gold Note**



63.    The "Modern Texas Redback 100 cg Gold Note" also uses the Texas Silhouette mint mark and accompanying Texas-themed logo elements on at least one side of the gold note, in substantially the same source-identifying manner as the 5 cg Redback Note.

64.    Texas Precious Metals did not design, manufacture, sell, or agree to sell the Redback Notes, and it did not authorize Defendant to place the TPM Registered Marks on any Unlicensed Products for third parties outside the Sales Agreement's limited license.

65.    The flagship Silhouette Mark and other trademarks used by Texas Precious Metals on and in connection with its products and services are not merely ornamental designs. In the

precious-metals industry, a "mint mark" is a critical symbol placed on products to indicate their source and authenticity. Texas Precious Metals' mint mark, the Silhouette Mark, functions as a signature source identifier relied upon by consumers when purchasing these products.

66.    Defendant—an experienced manufacturer of gold-note products—understood the meaning and role of mint marks and other source-identifying elements in the precious-metals market, particularly because Defendant had an existing commercial relationship with Texas Precious Metals and GBI concerning Texas-branded gold-note products and had negotiated the Sales Agreement provisions specifically addressing Texas Precious Metals' trademarks and likelihood of confusion.

67.    The Redback Notes are marketed and made available to consumers through common distribution channels used for precious-metals products, including national retailers. They are thus presented in the same market channels and to the same classes of purchasers as Texas Precious Metals' products.

68.    Notwithstanding Defendant's contractual commitments and knowledge, the Redback Notes use the Silhouette Mark and other TPM Registered Marks in precisely the manner the Sales Agreement restricts: as prominent, repeated, logo-like elements on precious-metals gold notes, in locations and contexts that communicate source, sponsorship, or endorsement to purchasers. In any event, the use is captured in the broadening language of the contract that forbids "any" use of marks owned by Texas Precious Metals.

69.    Defendant's inclusion of the Silhouette Mark, the Capitol Marks, the Rotunda Mark, and related Texas-themed source-identifying elements on the Redback Notes constitutes use of marks identical or confusingly similar to the TPM Registered Marks in a way that is likely to cause confusion, mistake, or deception regarding affiliation, sponsorship, or endorsement, and therefore violates the Sales Agreement. Accordingly, Texas Precious Metals has suffered and will continue to suffer irreparable harm absent injunctive relief.

## FIRST CLAIM FOR RELIEF

*Registered Trademark Infringement – 15 U.S.C. § 1114*

70.     Texas Precious Metals incorporates by reference all preceding allegations as if fully set forth here.

71.     Texas Precious Metals owns valid federal trademark registrations for the TPM Registered Marks used in connection with its precious-metals products and related goods and services.

72.     Pursuant to 15 U.S.C. § 1115(a), registrations on the Principal Register are *prima facie* evidence that the TPM Registered Marks are valid, that they are owned by Texas Precious Metals, and that Texas Precious Metals has the exclusive nationwide right to use such registered marks in commerce on or in connection with the goods and services identified in the registrations.

73.     Multiple TPM Registered Marks are incontestable under 15 U.S.C. § 1065. For those incontestable marks, the registrations constitute conclusive evidence that such trademarks are valid, that Texas Precious Metals owns them, and that Texas Precious Metals has the exclusive nationwide right to use such marks in commerce on or in connection with the registered goods and services.

74.     Without authorization, Defendant used in commerce reproductions, counterfeits, copies, or colorable imitations of the TPM Registered Marks (including the Silhouette Mark) in connection with the design, manufacture, marketing, distribution, offering for sale, and sale of the Redback Notes.

75.     Defendant's use of the TPM Registered Marks is likely to cause confusion, mistake, or deception among purchasers and prospective purchasers, including as to whether the Unlicensed Products are made by Texas Precious Metals, authorized by Texas Precious Metals, sponsored by Texas Precious Metals, endorsed by Texas Precious Metals, or otherwise affiliated with Texas Precious Metals.

76.     In particular, the Redback Notes prominently display the Silhouette Mark, the Capitol Marks, and the Rotunda Mark—along with other Texas-themed design elements

COMPLAINT                                        23

associated with the TPM Registered Marks—in a manner that functions as a source identifier within the precious-metals marketplace.

77.     By nonlimiting example, Defendant displayed and used in commerce a reproduction, copy, or colorable imitation of multiple TPM Registered Marks with the following images on its offerings in violation of Texas Precious Metals' federal trademark rights.



78.     As shown above circled in blue, Defendant incorporated the Silhouette Mark as a mint mark on its offering.



79.     As shown above outlined in blue, Defendant has incorporated the Texas Silhouette in a watermark-like manner in violation of Texas Precious Metals' federal trademark rights.



80.     As shown circled in blue, Defendant has utilized the Texas Star with "T", "E", "X", "A" and "S" between the points in violation of Texas Precious Metals' federal trademark rights. It further shows, within the star, an image of the view of the Texas state capitol rotunda that copies or is substantially similar to the Rotunda Mark in violation of Texas Precious Metals' federal trademark rights. It further shows a star overlaid on a silhouette of Texas in violation of Texas Precious Metals' federal trademark rights.



81.     As shown boxed in blue, above, Defendant prominently uses the capitol rotunda pattern image with the star with "T", "E", "X","," "A" and "S" between the points in the middle, in violation of Texas Precious Metals' federal Trademark rights.

COMPLAINT                                25



82.    As shown above outlined in blue, Defendant uses an oblique view of the Texas Capitol Building on its offering, in violation of Texas Precious Metals' federal trademark rights.

83.    The Redback Notes are marketed to and purchased by the same general class of consumers as Texas Precious Metals' products, through overlapping channels of trade, including online channels.

84.    As a result of the similarity of the marks and the relatedness of the goods and marketing channels, Defendant's conduct is likely to cause confusion as to source, affiliation, sponsorship, or endorsement.

85.    Defendant acted with knowledge of Texas Precious Metals' rights in the TPM Registered Marks, including because Defendant expressly acknowledged that Texas Precious Metals owned specified trademark registrations included within the TPM Registered Marks and agreed not to use identical or confusingly similar marks on its products in a manner likely to cause confusion.

86.    As a result of Defendant's infringement, Texas Precious Metals has suffered and will continue to suffer harm, including loss of control over the goodwill associated with the TPM Registered Marks, harm to its reputation for authenticity and quality, and loss of sales.

87.    Unless enjoined, Defendant's infringement will continue and will cause Texas Precious Metals irreparable injury.

COMPLAINT                                26

88.    Texas Precious Metals is entitled to relief under the Lanham Act, including injunctive relief, recovery of damages, disgorgement of Defendant's profits, costs, and such other relief as the Court deems just and proper.

89.    Defendant's conduct herein is willful and constitutes an "exceptional" case, entitling Texas Precious Metals to attorney's fees and enhanced damages.

## SECOND CLAIM FOR RELIEF

### *Trademark Counterfeiting – 15 U.S.C. §§ 1116(d), 1117(b)*

90.    Texas Precious Metals incorporates by reference all preceding allegations as if fully set forth here.

91.    Defendant engaged in the manufacture, distribution, and sale of counterfeit gold-note products, including the Redback Notes, bearing the TPM Registered Marks, which Defendant reproduced identically or in substantially indistinguishable form on products offered in competition with Texas Precious Metals' goods.

92.    These counterfeit uses are spurious marks that are identical with, or substantially indistinguishable from, Texas Precious Metals' registered trademarks, including the Silhouette Mark (U.S. Reg. Nos. 5,113,004 and 5,113,005), and were used on or in connection with the manufacture, distribution, offering for sale, and sale of the Redback Notes.

93.    Defendant used the counterfeit mark(s) in commerce willfully and with knowledge of Texas Precious Metals' prior rights, including through its contractual acknowledgment of Texas Precious Metals' trademark ownership, with the intent to deceive consumers, divert sales away from Texas Precious Metals' genuine products, and improperly benefit from Texas Precious Metals' established goodwill.

94.    Defendant's conduct constitutes willful counterfeiting in violation of 15 U.S.C. § 1114(1) and entitles Texas Precious Metals to enhanced remedies under 15 U.S.C. § 1117(b) or § 1117(c), including statutory damages of up to $2,000,000 per counterfeit mark per type of goods sold, or three times Defendant's profits or Texas Precious Metals' damages, whichever is greater.

95.     Texas Precious Metals further seeks an order under 15 U.S.C. §§ 1116(d) and 1118 directing the impoundment and destruction of all counterfeit goods, labels, packaging, and promotional materials in Defendant's possession, custody, or control.

### THIRD CLAIM FOR RELIEF

*Unregistered Trademark and Trade Dress Infringement, False Association, and Unfair*
*Competition – 15 U.S.C. § 1125(a)(1)(A)*

96.     Texas Precious Metals incorporates by reference all preceding allegations as if fully set forth here.

97.     Texas Precious Metals owns valid and protectable trademark rights under federal and state law in its federally registered trademarks and related common-law trademark rights, including the Silhouette Mark and other Texas-themed source identifiers used on Texas Precious Metals precious-metals goods and services.

98.     In the precious-metals and bullion industry, a "mint mark" is a symbol placed on bullion and other products to indicate origin and authenticity. Texas Precious Metals uses the Silhouette Mark as its mint mark, which consumers understand as identifying Texas Precious Metals as the source of its products.

99.     Without permission, Defendant used in commerce, in connection with the advertising, promotion, offering for sale, distribution, and sale of gold-note products, designations and symbols that are identical or confusingly similar to the TPM Marks, including the Silhouette Mark and other Texas-themed marks and imitations on the face or reverse of the three challenged Redback Notes.

100.     Defendant's uses are likely to cause confusion, mistake, and deception among relevant purchasers, including by creating the false and misleading impression that the Redback Notes originate with Texas Precious Metals or are made by Texas Precious Metals, affiliated with Texas Precious Metals, sponsored by Texas Precious Metals, or approved or authorized by Texas Precious Metals.

101.     The likelihood of confusion is heightened because, among other reasons:

a.    The Redback Notes are precious-metals products marketed to the same general class of consumers as Texas Precious Metals' precious-metals goods and services;

b.    Defendant placed the Silhouette Mark in a manner that functions as a mint mark and therefore as a source identifier, not merely as ornamentation; and

c.    The TPM Marks and the confusingly similar imitations used on the Redback Notes are the type of symbols consumers in this market rely on to identify the source and authenticity of precious-metals products.

102.    Defendant's acts were intentional, willful, and in disregard of Texas Precious Metals' rights, including because Defendant expressly acknowledged Texas Precious Metals' ownership of identified federal trademark registrations and, after notice, has continued its infringing conduct.

103.    As a direct and proximate result of Defendant's unfair competition and false designation of origin, Texas Precious Metals has suffered and will continue to suffer injury, including loss of control over the goodwill symbolized by the TPM Marks, damage to reputation and goodwill, and diversion of sales and business opportunities.

104.    Texas Precious Metals is entitled to relief under 15 U.S.C. §§ 1116 and 1117 and other applicable provisions, including injunctive relief, recovery of Defendant's profits and Texas Precious Metals' damages, corrective advertising and other equitable relief, costs, and, where warranted, enhanced monetary relief and attorneys' fees.

### FOURTH CLAIM FOR RELIEF

*Common-Law Trademark Infringement and Unfair Competition*

105.    Texas Precious Metals incorporates by reference all preceding allegations as if fully set forth here.

106.    Through longstanding use in commerce, Texas Precious Metals has acquired protectable common-law rights in the TPM Marks, including the Silhouette Mark and other Texas-themed source identifiers used with Texas Precious Metals' precious-metals goods and related services.

107.    Without consent, Defendant used the TPM Marks or confusingly similar imitations in commerce in connection with the advertising, promotion, offering for sale, distribution, and sale of the Redback Notes.

108.    Defendant's acts are likely to cause confusion, mistake, or deception regarding the source, affiliation, sponsorship, or approval of the Redback Notes, and therefore constitute common-law trademark infringement and unfair competition under Oregon law.

109.    Defendant's unlawful conduct has caused and will continue to cause Texas Precious Metals injury, including damage to reputation and goodwill and loss of control over the TPM Marks.

110.    Texas Precious Metals is entitled to all available remedies under Oregon common law, including injunctive relief and monetary relief.

## FIFTH CLAIM FOR RELIEF

*Secondary Trademark Infringement Liability*

111.    Texas Precious Metals incorporates by reference all preceding allegations as if fully set forth here.

112.    The Redback Notes have been marketed, offered for sale, distributed, and sold through third parties, including USGB and other retailers and channels, in a manner that infringes the TPM Marks and causes a likelihood of consumer confusion as to source, affiliation, sponsorship, or approval.

113.    Defendant is liable for secondary trademark infringement because Defendant knowingly and materially contributed to the infringement by such third-party sellers of the Redback Notes by designing, developing, manufacturing, supplying, or distributing the Redback Notes bearing the TPM Marks and confusingly similar imitations for downstream marketing and sale by such third-party sellers.

114.    Defendant had actual knowledge, or at minimum reason to know, of the infringing nature of the Redback Notes, including because:

a.    Defendant expressly acknowledged Texas Precious Metals' ownership of specified federal trademark registrations; and

b.    Defendant received notice of Texas Precious Metals' position regarding Defendant's Texas-themed uses and, notwithstanding that notice, continued the challenged conduct.

115.    By knowingly supplying the Redback Notes and enabling their downstream marketing and sale with the TPM Marks and confusingly similar imitations, Defendant intentionally induced or materially contributed to trademark infringement by third-party sellers of the Redback Notes.

116.    Defendant also had the right and ability to control, or participated in controlling, the infringing conduct at issue, including the content and configuration of the marks appearing on the Redback Notes, while deriving a direct financial benefit from the infringing sales of the Redback Notes.

117.    As a direct and proximate result of Defendant's contributory and vicarious infringement, Texas Precious Metals has suffered and will continue to suffer irreparable injury, including damage to goodwill and lost sales.

118.    Texas Precious Metals is entitled to injunctive relief and monetary and equitable relief available under the Lanham Act and applicable common law, including recovery of Defendant's profits, Texas Precious Metals' damages, corrective advertising and other equitable relief, costs, and, where warranted, enhanced damages and attorneys' fees.

### SIXTH CLAIM FOR RELIEF

*Breach of Contract*

119.    Texas Precious Metals incorporates by reference all preceding allegations as if fully set forth here.

120.    On or about September 23, 2025, Defendant entered into the Sales Agreement with GBI and Texas Precious Metals, pursuant to which it received a limited, non-transferable license—effectively only during the term of the Agreement and limited to products manufactured by

Defendant and sold to GBI under an accepted Purchase Order—to reproduce, display, include, or incorporate certain registered trademarks and related content owned by Texas Precious Metals in or on the covered products.

121.    The Sales Agreement identifies the "TPM Trademarks" by reference to five federal trademark registrations: U.S. Registration Nos. 4,788,152; 5,113,004; 6,031,097; 6,031,098; and 6,031,099.

122.    In Section 13(b), Defendant expressly acknowledged that the "TPM Trademarks" are the sole and exclusive property of Texas Precious Metals, and Defendant expressly agreed it would not design, develop, manufacture, market, distribute, or sell any product that displays, includes, or incorporates any mark or symbol identical or confusingly similar to a TPM Trademark when used as a source identifier, brand name, logo, or in any other manner that would constitute use of a TPM Trademark or create a likelihood of confusion, mistake, or deception as to affiliation, sponsorship, or endorsement by Texas Precious Metals.

123.    The Sales Agreement further provides that there is no adequate remedy at law for a breach of Section 13(b) and contemplates temporary, preliminary, and permanent injunctive relief (and related equitable relief) in the event of such a breach.

124.    The dispute in this action targets, at minimum, three Defendant-manufactured gold-note products marketed as: (a) "Modern Texas Redback – 20 cg Gold Note"; (b) "Modern Texas Redback – 5 cg Gold Note"; and (c) "Modern Texas Redback – 100 cg Gold Note" (collectively, the "Redback Notes").

125.    Defendant designed, developed, manufactured, marketed, distributed, supplied, or sold the Redback Notes, which display, include, or incorporate the TPM Marks or marks and symbols identical or confusingly similar to TPM Marks in breach of Section 13(b), including but not limited to use that is prominent, repeated, and logo-like source-identifying elements and in a manner likely to cause confusion as to affiliation, sponsorship, or endorsement by Texas Precious Metals.

126.    Defendant's design, manufacture, and sale of the Redback Notes fell outside the limited Sales Agreement license, which is tied to covered products manufactured and sold to GBI under accepted Purchase Orders, and independently violates the Sales Agreement's Section 13(b) non-use covenant governing Defendant's products.

127.    Texas Precious Metals has performed its obligations required for enforcement of the applicable Sales Agreement provisions, or any such performance has been excused.

128.    Defendant's breach has injured Texas Precious Metals, including by causing marketplace confusion, damaging the goodwill associated with its mint mark and other TPM Marks, and diverting sales or opportunities, resulting in damages in an amount to be proven at trial.

129.    Texas Precious Metals seeks all remedies available under the Sales Agreement and applicable law, including injunctive relief consistent with the Sales Agreement's equitable-relief provision, plus compensatory damages and costs in an amount to be proven.

### SEVENTH CLAIM FOR RELIEF

*Breach of the Implied Duty of Good Faith and Fair Dealing*

130.    Texas Precious Metals incorporates by reference all preceding allegations as if fully set forth here.

131.    The September 23, 2025 Sales Agreement among Texas Precious Metals, Defendant, and GBI is governed by Delaware law. Under Delaware law, every contract includes an implied covenant of good faith and fair dealing, which requires that no party act to deprive any other party of the fruits of the bargain or to frustrate the contract's spirit through arbitrary, unreasonable, or bad-faith conduct.

132.    A core purpose of the Sales Agreement was to protect valuable trademark rights owned by Texas Precious Metals—particularly its distinctive Texas-themed marks, including the Silhouette Mark used as its mint mark—and to ensure that any use of Texas-related imagery by Defendant would not function as a source identifier, would not appropriate Texas Precious Metals'

goodwill, and would not create a likelihood of confusion as to affiliation, sponsorship, or endorsement.

133.    The Sales Agreement reflects the parties' shared understanding that Defendant would not use the TPM Marks, or confusingly similar indicia, in a manner that undermines Texas Precious Metals' brand or diverts its associated goodwill to third parties.

134.    To the extent Defendant contends that certain conduct falls outside the literal wording of specific contractual prohibitions, the implied covenant prohibits opportunistic behavior that, while not expressly forbidden, was plainly not contemplated by the parties and defeats the reasonable contractual expectations of Texas Precious Metals.

135.    Defendant breached the implied covenant of good faith and fair dealing by engaging in conduct that, individually and collectively, subverted the Agreement's purpose and the justified expectations of Texas Precious Metals, including by designing, manufacturing, and supplying Texas-themed gold notes for a third party that prominently and repeatedly incorporate Texas Precious Metals' distinctive trademarks and branding elements in a manner that functions as a source identifier or quasi-source identifier and that improperly captures the commercial value of the TPM Marks.

136.    Defendant further breached the implied covenant by exploiting the parties' negotiated carve-outs and limitations as a pretext to appropriate the commercial value of the TPM Marks and to capture the very goodwill the Agreement was intended to protect.

137.    Defendant further breached the implied covenant by structuring product designs, layouts, and iconography to mimic Texas Precious Metals' protected mint mark and overall Texas-branded trade dress, while asserting post hoc that such uses are merely decorative.

138.    Defendant acted with knowledge that such uses would cause marketplace confusion, including confusion reflected in misdirected consumer inquiries and communications, yet proceeding without meaningful accommodation or corrective action.

139.    Through this conduct, Defendant unfairly deprived Texas Precious Metals of the principal benefits of the Sales Agreement—namely, the protection of the TPM Marks and

COMPLAINT                              34

goodwill—while reaping for itself, and for its third-party customer, the commercial advantages of Texas-themed branding that consumers associate with Texas Precious Metals.

140.    As a direct and proximate result of Defendant's breach of the implied covenant of good faith and fair dealing, Texas Precious Metals has suffered and continues to suffer damages, including loss of goodwill, loss of control over its trademarks and mint mark, reputational injury, marketplace confusion, and other economic and equitable harms in an amount to be proven at trial.

141.    Defendant's bad-faith conduct threatens ongoing and irreparable harm that cannot be fully remedied by damages. Texas Precious Metals is therefore entitled to injunctive and other equitable relief to prevent frustration of the Agreement's purpose and to restore the benefits of the bargain.

142.    This claim is pled in the alternative and in addition to the claim for breach of express contractual provisions. Texas Precious Metals does not seek to rewrite the Sales Agreement, but to enforce the parties' reasonable expectations and prevent opportunistic conduct that Delaware law forbids.

## V.    PRAYER FOR RELIEF

WHEREFORE, Texas Precious Metals respectfully requests that the Court enter judgment in favor of Texas Precious Metals and against Defendant, and award the following relief:

143.    A temporary restraining order, preliminary injunction, and permanent injunction enjoining Defendant and its officers, agents, servants, employees, attorneys, successors, assigns, and all persons acting in concert or participation with them from directly or indirectly:

a.    Using in commerce any of the TPM Marks, including the Silhouette Mark, or any reproduction, counterfeit, copy, or colorable imitation thereof, or any other mark or symbol that is identical or confusingly similar to the TPM Marks, in any manner likely to cause confusion, mistake, or deception;

b.    Designing, developing, manufacturing, supplying, marketing, advertising, promoting, distributing, offering for sale, or selling the accused Redback Notes (including the 5 cg, 20 cg, and 100 cg denominations) or any other products that bear, display,

incorporate, or use the TPM Marks or confusingly similar marks or symbols in a trademark or other source-identifying manner;

      c.     Representing, expressly or by implication, that Defendant or any Unlicensed Product is affiliated with, sponsored by, endorsed by, authorized by, or otherwise connected with Texas Precious Metals; and

      d.     Engaging in any further acts constituting trademark infringement, unfair competition, false designation of origin, contributory or vicarious infringement, or false advertising with respect to Texas Precious Metals or the TPM Marks.

144.    An order impounding during the pendency of this action, and after judgment delivering up for destruction or destroying, all infringing or unlawfully marketed products and materials in Defendant's possession, custody, or control, including:

      a.     All accused Redback Notes and any other products bearing the TPM Marks or confusingly similar marks or symbols;

      b.     All labels, packaging, inserts, advertising, marketing materials, displays, point-of-sale materials, and other promotional items bearing the TPM Marks or confusingly similar marks or symbols; and

      c.     All molds, plates, masters, digital artwork and design files, and other instrumentalities used to create or reproduce the accused infringing indicia.

145.    An order requiring Defendant to recall from the marketplace, distribution channels, and retailers all accused Redback Notes and all associated promotional and marketing materials bearing the TPM Marks or confusingly similar marks or symbols, including by providing written notice to downstream distributors, retailers, and other commercial customers who received such items, and by taking all commercially reasonable steps necessary to remove the Unlicensed Products from commerce.

146.    An order requiring Defendant, at its expense, to undertake corrective advertising or corrective notice reasonably designed to remedy marketplace confusion and dispel false

impressions of affiliation, sponsorship, authorization, or endorsement by Texas Precious Metals, in the manner and for the duration the Court deems appropriate.

147.    An order requiring Defendant to file with the Court and serve on Texas Precious Metals, within a period set by the Court after entry of injunctive relief, a written report under oath setting forth in detail the manner and form in which Defendant has complied with the Court's injunction and other equitable relief.

148.    An award to Texas Precious Metals of an accounting and disgorgement of all profits Defendant derived, directly or indirectly, from the challenged conduct, including profits attributable to the accused Redback Notes and related advertising and marketing.

149.    An award to Texas Precious Metals of actual damages in an amount to be proven at trial, including damages caused by: (a) Defendant's breach of contract, including all damages and equitable relief available under the parties' agreements and applicable law; and (b) Defendant's direct and secondary infringement, unfair competition, false designation of origin, and false advertising.

150.    In the alternative, an award of statutory damages, if elected by Texas Precious Metals at trial, in lieu of actual damages and profits, in the amount permitted by law, including statutory damages under 15 U.S.C. § 1117(c) for any proven use of counterfeit marks, in an amount up to $2,000,000 per counterfeit mark per type of goods sold (for willful counterfeiting).

151.    To the extent permitted by law and supported by the evidence, an award of enhanced monetary relief, including treble damages in an amount the Court deems just.

152.    To the extent permitted by law and proven at trial, an award of monetary relief that includes the reasonable costs of corrective advertising and other remedial measures necessary to counteract confusion and repair harm to Texas Precious Metals' goodwill.

153.    An award of prejudgment and post-judgment interest on all monetary awards, as allowed by law, including at any contractually applicable rate if proven and applicable.

154.    An award of Texas Precious Metals' costs of suit and reasonable attorneys' fees, including under the Lanham Act (including on an "exceptional case" basis) or as otherwise authorized by contract or applicable law.

155.    Such other and further legal and equitable relief as the Court deems just and proper.


Dated: January 23, 2026

                                                      s/ *Michael E. Zeliger*
                                                      Michael E. Zeliger (CA Bar No. 271118)
                                                      michael.zeliger@pillsburylaw.com
                                                      Steven Tepera (TX Bar No. 24053510)
                                                      steven.tepera@pillsburylaw.com
                                                      Jon Jekel (CA Bar No. 298646)
                                                      jon.jekel@pillsburylaw.com
                                                      Ryan Sullivan (TX Bar No. 24102548)
                                                      ryan.sullivan@pillsburylaw.com
                                                      401 West 4th Street, Suite 3200
                                                      Austin, TX 78701
                                                      Telephone: 512.580.9600
                                                      **PILLSBURY WINTHROP SHAW PITTMAN LLP**
                                                      (*pro hac vice applications forthcoming*)

                                                      Kenneth R. Davis, II, OSB No. 971132
                                                      daviskr@ballardspahr.com
                                                      Mohammed N. Workicho, OSB No. 186140
                                                      workichom@ballardspahr.com
                                                      601 S.W. Second Avenue, Suite 2100
                                                      Portland, Oregon 97204
                                                      Telephone: 503.778.2100
                                                      Facsimile: 503.778.2200
                                                      **BALLARD SPAHR LLP**
                                                      *ATTORNEYS FOR PLAINTIFF*
                                                      *TEXAS PRECIOUS METALS, LLC*

COMPLAINT                                38