Michael E. Zeliger (CA Bar No. 271118)
michael.zeliger@pillsburylaw.com
Steven Tepera (TX Bar No. 24053510)
steven.tepera@pillsburylaw.com
Jon Jekel (CA Bar No. 298646)
jon.jekel@pillsburylaw.com
Ryan Sullivan (TX Bar No. 24102548)
ryan.sullivan@pillsburylaw.com
Sam E. Iverson (NY Bar No. 6212468) *(pro hac vice forthcoming)*
sam.iverson@pillsburylaw.com
PILLSBURY WINTHROP SHAW PITTMAN LLP
401 West 4th Street, Suite 3200
Austin, TX 78701
512.580.9600

Kenneth R. Davis, II, OSB No. 971132
daviskr@ballardspahr.com
Mohammed N. Workicho, OSB No. 186140
workichom@ballardspahr.com
BALLARD SPAHR LLP
601 S.W. Second Avenue, Suite 2100
Portland, Oregon 97204
Telephone: 503.778.2100
Facsimile: 503.778.2200

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| TEXAS PRECIOUS METALS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>VALAURUM, INC.,<br><br>Defendant. | Case No.: 3:26-cv-00157-SI<br><br>**PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS & AUTHORITIES**<br><br>**EXPEDITED HEARING REQUESTED**<br><br>**ORAL ARGUMENT REQUESTED**<br><br>Judge:  Honorable Michael H. Simon |

1

**CERTIFICATE OF COMPLIANCE**

Pursuant to LR 7-1(a), Plaintiff Texas Precious Metals made a good-faith effort to resolve the dispute with Defendant Valaurum, Inc. and was unsuccessful. Pursuant to LR 7-2, this brief complies with the applicable page and word limit because it is less than 35 pages and has 9,431 words, excluding the caption, table of contents, table of authorities, signature block, and any certificates of counsel.

**MOTION**

Plaintiff Texas Precious Metals, LLC ("**Texas Precious Metals**") moves the Court for entry of a preliminary injunction against Defendant Valaurum, Inc. ("**Defendant**") pursuant to Fed. R. Civ. P. 65. In particular, Texas Precious Metals seeks a preliminary injunction barring Defendant and its officers, agents, employees, and other persons acting in concert or participation with Defendant from manufacturing, supplying, marketing, distributing, or selling unlicensed products bearing Texas Precious Metals' trademarks or confusingly similar variations thereof.

Defendant's conduct has caused and will continue to cause immediate and irreparable harm to Texas Precious Metals' trademark rights, goodwill, and contractual interests unless enjoined pending final resolution of this action. The parties expressly agreed in a September 23, 2025 Sales Agreement that Defendant's activities described in the Complaint would cause harm for which there is no adequate remedy at law, and that in the event of such a breach, Texas Precious Metals would be entitled to preliminary and permanent injunctive relief, without proof of damages and without the need to post any bond.

Texas Precious Metals' request is based on this Motion, the Complaint and the core documents identified therein (including the Sales Agreement and related agreements), the accompanying Memorandum of Points and Authorities, the declarations and exhibits filed concurrently herewith, the pleadings and records on file in this action, and any further written or oral argument the Court may permit.

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

TABLE OF CONTENTS

Page

CERTIFICATE OF COMPLIANCE .................................................................................... 2

MOTION ............................................................................................................................. 2

MEMORANDUM OF POINTS AND AUTHORITIES.......................................................... 1

I.     INTRODUCTION ...................................................................................................... 1

II.    FACTUAL BACKGROUND ..................................................................................... 2

III.   LEGAL STANDARD ................................................................................................ 8

IV.    ARGUMENT ............................................................................................................. 9

    A.    Texas Precious Metals is likely to succeed on its Breach of Contract
        claim. ................................................................................................................ 11

    B.    Texas Precious Metals will succeed on its infringement and counterfeiting claims. 12

        1.    Texas Precious Metals owns valid, protectable trademarks............................ 12

        2.    Defendant used multiple trademarks in commerce in a  manner
            likely to confuse, mislead, or deceive consumers. ........................................... 13

            a.    Counterfeiting gives rise to a presumption of likely confusion............. 14

            b.    The *Sleekcraft* Factors confirm likely confusion as to the other
                TPM Marks. ............................................................................................ 16

                (1)  Strength of the TPM Marks. ............................................................ 17

                (2)  Relatedness and proximity of the products. ................................... 19

                (3)  Similarity of the marks and overall commercial impression.......... 19

                (4)  Actual confusion has already occurred. ........................................ 21

                (5)  Overlapping marketing channels....................................................... 23

                (6)  Degree of purchaser care. ................................................................ 24

                (7)  Defendant's knowledge and deliberate adoption. .......................... 24

                (8)  Likelihood of expansion of product lines or markets.................... 25

    C.    Texas Precious Metals will suffer irreparable harm absent injunctive relief. ........... 26

        1.    Texas Precious Metals is entitled to a presumption of irreparable harm. ........ 26

        2.    The Sales Agreement confirms the inadequacy of legal remedies.................. 27

    D.    The balance of equities tips sharply in Texas Precious Metals' favor. .................... 27

    E.    The public interest favors preliminary relief. ............................................................ 28

    F.    The Court should dispense with any bond requirement or, at most, require only
        nominal security. ........................................................................................... 29

V.     CONCLUSION......................................................................................................... 30

3

TABLE OF AUTHORITIES

Page(s)

Cases

*2Die4Kourt v. Hillair Cap. Mgmt., LLC*,
    692 F. App'x 366 (9th Cir. 2017) ...................................................................................27

*AECOM Energy & Constr., Inc. v. Morrison Knudsen Corp.*,
    748 F. App'x 115 (9th Cir. 2018) ...................................................................................29

*All. for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011) .........................................................................................9

*Am. Int'l Grp., Inc. v. Am. Int'l Bank*,
    926 F.2d 829 (9th Cir. 1991) .........................................................................................22

*Am. Rena Int'l Corp. v. Sis-Joyce Int'l Co.*,
    534 F. App'x 633 (9th Cir. 2013) ...................................................................................29

*AMF Inc. v. Sleekcraft Boats*,
    599 F.2d 341 (9th Cir. 1979) ................................................................................. *passim*

*Applied Info. Scis. Corp. v. eBAY, Inc.*,
    511 F.3d 966 (9th Cir. 2007) .........................................................................................12

*Barahona-Gomez v. Reno*,
    167 F.3d 1228 (9th Cir. 1999) .........................................................................................9

*BGC Inc. v. Robinson*,
    No. 22-CV-01582-JSW, 2022 WL 2915703 (N.D. Cal. July 25, 2022)..............................27

*Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*,
    174 F.3d 1036 (9th Cir. 1999) ...............................................................................13, 17, 18, 20

*Century 21 Real Est. Corp. v. Sandlin*,
    846 F.2d 1175 (9th Cir. 1988) .........................................................................................8

*Concrete Mach. Co. v. Classic Lawn Ornaments, Inc.*,
    843 F.2d 600 (1st Cir. 1988)..........................................................................................28

*Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*,
    321 F.3d 878 (9th Cir. 2003) .........................................................................................30

*Diller v. Barry Driller, Inc.*,
    No. CV 12-7200 ABC EX, 2012 WL 4044732 (C.D. Cal. Sept. 10, 2012) .....................26, 28

4

*Dr. Seuss Enters., L.P. v. Penguin Books USA*,
109 F.3d 1394 (9th Cir. 1997) ...................................................................................26

*Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*,
924 F. Supp. 1559 (S.D. Cal. 1996)............................................................................28

Ex. 2. *Edwards Farms, Inc. v. Smith Canning & Freezing Co.*,
197 Or. 57, 251 P.2d 133 (1952) ..................................................................... *passim*

*Faizi v. Temori*,
No. 22-CV-04224-VKD, 2022 WL 7094259 (N.D. Cal. Oct. 12, 2022) ..........................29, 30

*Fiji Water Co., LLC v. Fiji Min. Water USA, LLC*,
741 F. Supp. 2d 1165 (C.D. Cal. 2010) ........................................................................9

*GoTo.com, Inc. v. Walt Disney Co.*,
202 F.3d 1199 (9th Cir. 2000) .......................................................................23, 25, 30

*GS Holistic, LLC v. Bubbles Smoke Shop*,
No. CV233391MWFMRWX, 2023 WL 6787773 (C.D. Cal. Sept. 5, 2023).........................14

*Hokto Kinoko Co. v. Concord Farms, Inc.*,
810 F. Supp. 2d 1013 (C.D. Cal. 2011) ......................................................................24

*Internet Specialties W., Inc. v. Milon-DiGiorgio Enters., Inc.*,
559 F.3d 985 (9th Cir. 2009) ...................................................................................29

*Johnson v. Couturier*,
572 F.3d 1067 (9th Cir. 2009) ....................................................................................9

*Jorgensen v. Cassiday*,
320 F.3d 906 (9th Cir. 2003) ................................................................................9, 30

*M'Otto Enters., Inc. v. Redsand, Inc.*,
831 F. Supp. 1491 (W.D. Wash. 1993)........................................................................26

*Microsoft Corp. v. Buy More, Inc.*,
703 F. App'x 476 (9th Cir. 2017) ..............................................................................14

*Moroccanoil, Inc. v. Moroccan Gold, LLC*,
590 F. Supp. 2d 1271 (C.D. Cal. 2008) ......................................................................29

*N. Atl. Instruments, Inc. v. Haber*,
188 F.3d 38 (2d Cir. 1999)......................................................................................27

*Neighborhood Assistance Corp. of Am. v. First One Lending Corp.*,
No. SACV 12-463 DOC MLGX, 2012 WL 1698368, at *6 (C.D. Cal. May 15, 2012) .10, 11,
13, 27

5

*Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*,
   638 F.3d 1137 (9th Cir. 2011) ..................................................................................22

*Off. Airline Guides, Inc. v. Goss*,
   6 F.3d 1385 (9th Cir. 1993) .................................................................................23, 25

*PetConnect Rescue, Inc. v. Salinas*,
   656 F. Supp. 3d 1131 (S.D. Cal. 2023)......................................................................13

*Pom Wonderful LLC v. Hubbard*,
   775 F.3d 1118 (9th Cir. 2014) ..................................................................................17

*Roche Diagnostics Corp. v. Med. Automation Sys., Inc.*,
   646 F.3d 424 (7th Cir. 2011) .....................................................................................9

*Sierra On-Line, Inc. v. Phoenix Software, Inc.*,
   739 F.2d 1415 (9th Cir. 1984) ....................................................................................9

*Slover v. Oregon State Bd. of Clinical Soc. Workers*,
   144 Or. App. 565 (1996)............................................................................................11

*State of Idaho Potato Comm'n v. G & T Terminal Packaging, Inc.*,
   425 F.3d 708 (9th Cir. 2005) ....................................................................................15

*Ticor Title Ins. Co. v. Cohen*,
   173 F.3d 63 (2d Cir. 1999).........................................................................................27

*Tie Tech, Inc. v. Kinedyne Corp.*,
   296 F.3d 778 (9th Cir. 2002) ....................................................................................13

*U-Haul Int'l, Inc. v. Jartran, Inc.*,
   793 F.2d 1034 (9th Cir. 1986) ..................................................................................25

*UL LLC v. Space Chariot Inc.*,
   250 F. Supp. 3d 596 (C.D. Cal. 2017) ..................................................................12, 20

*Warner Bros. Ent. Inc. v. WTV Sys., Inc.*,
   824 F. Supp. 2d 1003 (C.D. Cal. 2011) ....................................................................28

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008)....................................................................................................9, 28

*Y.Y.G.M. SA v. Redbubble, Inc.*,
   75 F.4th 995 (9th Cir. 2023) .....................................................................................15

6

Statutes and Codes

United States Code
Title 15, Section 1072................................................................................................26
Title 15, Section 1114................................................................................................12
Title 15, Section 1114(1) ...........................................................................................12
Title 15, Section 1115..................................................................................................4
Title 15, Section 1115(a)............................................................................................13
Title 15, Section 1115(b) ...........................................................................................13
Title 15, Section 1116(a)...................................................................................8, 11, 27
Title 15, Section 1116(d) ...........................................................................................12
Title 15, Section 1116(d)(1)(B)(i)..............................................................................12
Title 15, Section 1125................................................................................................12
Title 15, Section 1125(a)..............................................................................................8
Title 15, Section 1125(a)(1)(A) .................................................................................12
Title 15, Section 1125(c)..............................................................................................8
Title 15, Section 1127...................................................................................12, 14, 15

Rules and Regulations

Federal Rules of Civil Procedure
Rule 65(c)...................................................................................................9, 29, 30

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.     INTRODUCTION

For more than fifteen years, Texas Precious Metals, LLC ("**Texas Precious Metals**" or "**TPM**") has marketed and sold precious metals products under a family of Texas-themed trademarks that enjoy nationwide recognition and protection under federal law. TPM has built substantial goodwill and consumer recognition around its Texas-themed marks, foremost among them the Texas-silhouette "mint mark"[1] used on its products (the "**Silhouette Mark**"). To protect the integrity of those marks, TPM has invested in building a portfolio of U.S. trademark registrations relevant to this dispute (the "**TPM Marks**"), including: (1) three registrations for the Silhouette Mark, two of which are registered on the Principal Register and incontestable, and a third that has remained on the Supplemental Register for more than fifteen years; (2) incontestable Principal Register registrations for two composite, Texas-themed logos featuring the Silhouette Mark; (3) two Supplemental Register registrations for logos depicting oblique-angle views of the Texas State Capitol (the "**Capitol Marks**"); and (4) a Supplemental Register registration for a logo depicting an orthogonal interior view of the Texas State Capitol rotunda (the "**Rotunda Mark**").

This motion rests on two independent grounds for injunctive relief: contractual and statutory. ***First***, with respect to TPM's contractual claim, Defendant Valaurum, Inc. ("**Defendant**") entered into a written agreement under which it received a limited license to use the Silhouette Mark and other TPM trademarks and designs solely for the manufacture of specified products. Defendant agreed that it would not use TPM's trademarks for any other purpose and expressly consented to injunctive relief in the event of breach. Defendant nevertheless breached that agreement by manufacturing and selling counterfeit products. TPM now seeks the injunctive relief to which the parties agreed TPM would be entitled.

***Second***, with respect to TPM's statutory claim, the Lanham Act independently prohibits Defendant's use of those marks in a manner likely to cause confusion. That likelihood is

---

[1] A "mint mark" is a small letter, symbol, or inscription placed on precious metals products to identify their source, authenticity, and purity.

established here both as a matter of law—because the accused marks are counterfeits—and as a matter of fact, as demonstrated by actual consumer behavior. TPM is therefore entitled to injunctive relief.

Irreparable harm is not speculative; it is imminent and ongoing. Absent injunctive relief, Texas Precious Metals will lose control over the goodwill and authenticity embodied in its trademarks, resulting in irreparable harm that is not readily quantifiable. Accordingly, TPM respectfully requests a preliminary injunction barring Defendant's manufacture, supply, marketing, distribution, and sale of any products bearing TPM's trademarks or confusingly similar variations. Texas Precious Metals further requests that the Court waive security, or require only a nominal bond, consistent with Defendant's contractual agreement that such relief should issue "without the need to post any bond."

## II.     FACTUAL BACKGROUND

Texas Precious Metals is a Texas-based company that buys, sells, and stores precious metals for customers nationwide, including through an online platform that ships products across state lines. Declaration of Tarek Saab ("**Saab Decl.**"), ¶ 3. It is known for selling precious metals products in gold, silver, and platinum—such as coins, bars, rounds, and gold notes—under distinctive, Texas-themed trademarks. *Id.* While "coins" are understood in the industry to be legal tender issued by sovereigns, "bars" and "rounds" are precious metals often minted from blanks and stamped with certain markers (*e.g.*, mint marks, trademarks, indicia of purity, ornamentation). *Id.*, ¶ 4. A "gold note" is a flexible polymer product akin to a bank note containing certain amounts of gold indicated by the denomination of the product. *Id.* TPM expends significant time, energy, and resources to build and maintain its reputation, brand, and standing within the precious metals industry, including through its sales, industry participation, and professional affiliations, all of which reflect its commitment to best practices and marketplace integrity. *Id.*, ¶ 5.

TPM's Texas-themed, TPM-branded bullion products are marketed both to investors and collectors and are designed to retain value and recognizability over time. *Id.*, ¶ 6. Since these products are often resold, traded, and collected in secondary markets, counterfeits can circulate for

years after an initial sale, making it difficult to trace, correct, or contain confusion once it begins. *Id.*

Since at least as early as 2011, Texas Precious Metals has used a family of Texas-themed trademarks in connection with the sale, offering for sale, and advertising of a wide array of precious metals-related goods and services. *Id.*, ¶ 7. TPM's brand identity and goodwill are closely tied to its Texas-themed trademarks, the core of which branding are a series of trademarks that include or consist of the Silhouette Mark, which appears as follows:



*Id.* Texas Precious Metals uses the Silhouette Mark as a mint mark—the industry-standard means by which precious metals purchasers identify the source, authenticity, and legitimacy of privately minted products. *Id*. In the precious metals market, mint marks are relied upon not as decoration, but as essential indicators of origin, particularly for products that are traded, resold, and held for investment. *Id.* Both Texas Precious Metals and its customers treat the Silhouette Mark as a critical indicator of origin and legitimacy. *Id.*

TPM carefully controls the use of its trademarks (particularly the Silhouette Mark) because consumers, dealers, and secondary-market purchasers rely on consistent mint marks to authenticate products, assess quality, and make investment decisions in a national market where products are evaluated based on metal content, liquidity, premiums over spot price, and the reliability of the source. *Id.*, ¶ 8. Because many purchasers cannot conduct meaningful authenticity testing at the point of sale, they place substantial weight on trusted marks. *Id.* Indeed, customers routinely contact Texas Precious Metals to verify the authenticity of products bearing the Silhouette Mark, and Texas Precious Metals maintains internal procedures to respond to such inquiries. *Id.*

Texas Precious Metals owns multiple U.S. trademark registrations relevant to this dispute (the "**TPM Marks**"), including:

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

(1)    Three registrations for the Silhouette Mark—two on the Principal Register and incontestable under 15 U.S.C. § 1115 (U.S. Reg. Nos. 5113004 and 5113005), and one on the Supplemental Register since 2013 (U.S. Reg. No. 4404997).

(2)    Incontestable registrations for the following composite logos featuring the Silhouette Mark (U.S. Reg. Nos. 4788152 and 5076058):

 

(3)    Two registrations on the Supplemental Register for the Capitol Marks (U.S. Reg. Nos. 6031097 and 6031098), which appear as follows:

 

(4)    One registration on the Supplemental Register for the Rotunda Mark (U.S. Reg. No. 6031099), which appears as follows:



*See id.*, ¶ 9; *see also* Declaration of Sam E. Iverson ("**Iverson Decl.**"), ¶¶ 2–10, Ex. 1. To date, the TPM Marks have been used in connection with more than 200,000 customer transactions nationwide, across all 50 states, generating total revenues in excess of $4 billion. Saab Decl., ¶ 10.

On September 23, 2025, Texas Precious Metals entered into a three-party agreement (the "**Sales Agreement**") with Defendant and Goldback, Inc. whereby Defendant agreed to manufacture a Texas-themed gold note product featuring trademarks and designs created by TPM. *Id.*, ¶ 11, Ex. 2. Three provisions are key to this Motion:

Section 12(a): Texas Precious Metals granted Defendant a "limited, non-exclusive, non-

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

transferable, non-sublicensable right and license solely during the term of [the Sales Agreement] to, reproduce, display, include, or incorporate" the "TPM Trademarks" and other trade names, logos, images, and elements in the design, artwork, and branding materials for the products made under the contract. *Id.*, ¶ 13, Ex. 2 at 5.

Section 13(b): In exchange, Defendant agreed to an *exceptionally broad restriction* on its use of TPM's trademarks. Defendant agreed that Texas Precious Metals is the "sole and exclusive owner" of the "TPM Trademarks" (U.S. Reg. Nos. 4788152, 5113004, 6031097, 6031098, and 6031099) and any goodwill resulting from Defendant's use of such marks. it would not "design, develop, manufacture, market, distribute, or sell **any** product . . . that displays, includes, or incorporates any mark or symbol that is identical to, or confusingly similar to, any TPM Trademark," whether such use appears as a traditional trademark (*i.e.*, "as a source identifier, brand name, logo") **or** in "*any other manner* that would constitute use of a TPM Trademark **or** create a likelihood of confusion, mistake, or deception as to the affiliation of [such product] with, or the sponsorship or endorsement of [such product] by" TPM. *Id.*, ¶ 14, Ex. 2 at 6–7 (emphasis added).

Section 20(i): Defendant "admit[ted] that there would be no adequate remedy at law for its breach of Section 13(b) of this Agreement," and "in the event of such breach, TPM will be entitled to equitable relief by way of temporary, preliminary, and permanent injunction . . . without proof of any actual or special damages and without the need to post any bond." *Id.*, ¶ 15, Ex. 2 at 12.

Despite these commitments, Defendant entered into a separate agreement to manufacture and distribute precious metals products bearing the same registered trademarks it agreed were owned by Texas Precious Metals (the **"Counterfeit Products"**) for Texas Precious Metals'

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

competitor, United States Gold Bureau ("**USGB**"). *Id.*, ¶ 16. The three Counterfeit Products of which Texas Precious Metals is currently aware appear as follows:



| Front of Note | Back of Note |
|---|---|

*Id.*, ¶ 17. These products feature marks that are identical to, or substantially indistinguishable from, the TPM Marks, including the Silhouette Mark, the Capitol Marks, and the Rotunda Mark. *Id.*, ¶ 18. For ease of comparison, the table below presents side-by-side, zoomed-in excerpts from the Counterfeit Products and the relevant marks.

| Counterfeit Products | | TPM Marks | |
|---|---|---|---|
| (All denominations) | (Blue emphasis added) (All denominations) | | |

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

| Counterfeit Products | TPM Marks |
|---|---|
| (20 centigrams only) | |
| (20 centigrams only) | |

The Counterfeit Products are:

- The same types of goods covered by the TPM Marks (*Id.*, ¶ 19; Iverson Decl., ¶¶ 2–10, Ex. 1);

- Positioned to compete in the same emerging market as the authentic products authorized by the Sales Agreement (Saab Decl., ¶ 20);

- Sold in the same trade channels as Texas Precious Metals' products (*Id.*, ¶ 21); and

- Targeted to the same customer base as Texas Precious Metals' products (*Id.*, ¶ 22).

Texas Precious Metals made substantial, good-faith efforts to resolve the dispute without resorting to litigation over a period of more than two months. *Id.*, ¶ 23. During that period, Texas Precious Metals understood and reasonably believed, based on Defendant's representations and course of dealing, that Defendant was not introducing the Counterfeit Products into the market in substantial quantities. *Id.* Upon learning of the Counterfeit Products, Texas Precious Metals notified Defendant of its concerns and explained that the manufacture and distribution of Counterfeit Products bearing the Silhouette Mark and other TPM Marks would infringe TPM's

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

trademark rights. *Id.*, ¶ 24. After one of many CEO-to-CEO communications between the parties about the issue, Defendant agreed to remove the Silhouette Mark from *a single location* on the top-left of the Counterfeit Products but refused to remove any of the other disputed trademark elements. *Id.*, ¶ 25, Ex. 3.

While acknowledging TPM's concerns, Defendant nonetheless elected to proceed, with its attorney stating that its customer for the Counterfeit Products "has its own priorities for design which must be balanced and managed" against TPM's trademark rights. Compl. ¶ 48; *see also* Saab Decl., ¶ 26, Ex. 4. As a compromise, in an effort to avoid litigation and accommodate Defendant's stated business concerns, Texas Precious Metals proposed a retroactive license that would have permitted Defendant to continue manufacturing those products in exchange for a license fee. Saab Decl., ¶ 27. Defendant rejected that proposal and is now poised to proceed with large-scale manufacturing and distribution of the Counterfeit Products unless it is enjoined. *Id.*, ¶ 28. If Defendant proceeds with substantial distribution of the Counterfeit Products, Texas Precious Metals will lose control over the quality, presentation, and reputation associated with its marks at a critical moment for this emerging product category, and its goodwill will be harmed among consumers and industry participants in ways that are difficult to unwind after counterfeits enter circulation. *Id.*, ¶ 29.

## III.    LEGAL STANDARD

Under the Lanham Act, this Court has "power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office or to prevent a violation under [15 U.S.C. § 1125(a), (c), or (d)]." 15 U.S.C. § 1116(a). Injunctive relief is often the remedy of choice because ongoing infringement typically does not present an adequate remedy at law. *Century 21 Real Est. Corp. v. Sandlin*, 846 F.2d 1175, 1180 (9th Cir. 1988).

A party may obtain a preliminary injunction by showing that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *See Fiji Water*

*Co., LLC v. Fiji Min. Water USA, LLC*, 741 F. Supp. 2d 1165, 1172 (C.D. Cal. 2010) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24–25 (2008); *Am. Trucking Associations, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009)). The Ninth Circuit applies a "sliding scale" approach under which "a stronger showing of one element may offset a weaker showing of another," so long as the moving party satisfies the *Winter* framework. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). A district court may consider otherwise inadmissible evidence, including hearsay, when evaluating a preliminary injunction motion. *Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009). At this stage, the Court need not determine that Texas Precious Metals will ultimately prevail; it need only find that there is a probability of success at trial. *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1423 (9th Cir. 1984).

Fed. R. Civ. P. 65(c) requires the movant to give security "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined." The amount of security lies within the Court's discretion, and in this Circuit, the Court may dispense with security or require only a nominal bond. *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999); *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003). Contractual agreements that no bond is required are generally enforceable. *See, e.g.*, *Roche Diagnostics Corp. v. Med. Automation Sys., Inc.*, 646 F.3d 424, 428–429 (7th Cir. 2011).

### IV.    ARGUMENT

Texas Precious Metals has two independent and complementary grounds for injunctive relief: breach of contract and Lanham Act claims. While there is overlap between these theories— and Texas Precious Metals is entitled to relief under either one—the contractual path for relief is independently sufficient and, by its terms, exceptionally broad. The Sales Agreement categorically bars "any" use of the "TPM Trademarks," and Defendant explicitly agreed that injunctive relief would be appropriate in the event of a breach.

The primary provisions supporting injunctive relief are set forth below. ***First***, Defendant agreed in Section 13(b) of the contract that it would not "develop . . . any product . . . that displays

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

. . . any TPM Trademark [in] any [] manner that would constitute use of a TPM Trademark or create a likelihood of confusion."

> (b) Seller acknowledges and agrees that (i) the federal trademark registrations identified on Exhibit C attached hereto (the "TPM Trademarks") are the sole and exclusive properties of TPM, (ii) Seller will not design, develop, manufacture, market, distribute, or sell any product (a "Seller Product") that displays, includes, or incorporates any mark or symbol that is identical to, or confusingly similar to, any TPM Trademark when such mark or symbol is used as a source identifier, brand name, logo, or in any other manner that would constitute use of a TPM Trademark or create a likelihood of confusion, mistake, or deception as to the affiliation of the Seller Product with, or the sponsorship or endorsement of the Seller Product by, TPM, and Seller will not sell, ship, or otherwise dispose of any Product except in accordance with a Purchase Order hereunder, . . . , and (iv) all goodwill resulting from the use of the TPM Trademarks shall inure to the benefit of TPM.

*See* Saab Decl., ¶¶ 11–15, Ex. 2 at 6–7. The provision is deliberately expansive. The "or" is important. It is drafted in the disjunctive to capture every conceivable form of unauthorized trademark use in the precious metals industry. Defendant is prohibited from using the marks whether such use is *as a trademark* ("as a source identifier, brand name, logo . . .") *or otherwise* ("or in any other manner that would constitute use . . .").

**Second**, Defendant agreed in Section 20(i) that any breach of Section 13(b) would entitle Texas Precious Metals to injunctive relief.

> Equitable Relief. Seller acknowledges and admits that there would be no adequate remedy at law for its breach of Section 13(b) of this Agreement. Seller agrees that, in the event of such breach, TPM will be entitled to equitable relief by way of temporary, preliminary, and permanent injunction . . . without proof of any actual or special damages and without the need to post any bond.

*See id.*, Ex. 2 at 12. The provision ties the conduct at issue here to mandatory injunctive relief, acknowledging that "there is no adequate remedy at law" for a breach of Section 13(b). TPM is entitled to the injunctive relief for which the parties contracted.

Independently, the trademark infringement described herein falls within the category of Lanham Act violations that warrant injunctive relief. That entitlement has been reinforced by the Trademark Modernization Act of 2020, which provides that a plaintiff seeking a preliminary injunction or temporary restraining order is "entitled to a rebuttable presumption of irreparable

harm" for the types of violations alleged in this case. *See* 15 U.S.C. §1116(a). Texas Precious Metals is thus independently entitled to injunctive relief under federal statute.

Texas Precious Metals provides its fuller analysis below.

### A.    <u>Texas Precious Metals is likely to succeed on its Breach of Contract claim.</u>

To state a claim for breach of contract, Texas Precious Metals must allege the existence of a contract, the relevant contractual terms, the plaintiff's performance or excuse from performance, the defendant's breach, and resulting damages. *Slover v. Oregon State Bd. of Clinical Soc. Workers*, 144 Or. App. 565, 570 (1996).

*First*, there is no dispute that the Sales Agreement is a valid contract; it is fully executed by both Texas Precious Metals and Defendant and presumed to be valid. Saab Decl., ¶11; <u>Ex. 2</u>. *Edwards Farms, Inc. v. Smith Canning & Freezing Co.*, 197 Or. 57, 62, 251 P.2d 133, 135 (1952) (presumption of validity).

*Second*, under Section 20(h) of the Sales Agreement, TPM is a party only with respect to eight discrete provisions: Sections 12–14 and 16–20. *See* Saab Decl., ¶ 11, <u>Ex. 2</u> at 12. TPM performed its obligations under each of those provisions; nothing suggests otherwise.

*Third*, Defendant's breach of Section 13(b) is clear. Section 12(a) granted Defendant a narrow license, solely during the term of the Sales Agreement, to manufacture specified products featuring Texas Precious Metals' trademarks and designs. Saab Decl., ¶¶ 13–14, <u>Ex. 2</u> at 5. Section 13(b) reinforces and limits that license by confirming that Texas Precious Metals is the sole and exclusive owner of the "TPM Trademarks" and any goodwill resulting from their use and barring Defendant from claiming an ownership interest in those marks beyond the license. Compl. ¶ 41; *see also* Saab Decl., ¶ 14, <u>Ex. 2</u> at 6–7. Section 13(b) further prohibits Defendant from designing, developing, manufacturing, marketing, distributing, or selling any product that "displays, includes, or incorporates any mark or symbol that is identical to, or confusingly similar to, any TPM Trademark," when such mark or symbol is used "as a source identifier, brand name, logo, or in any other manner that would constitute use of a TPM Trademark or create a likelihood of

11

confusion, mistake, or deception" as to affiliation, sponsorship, or endorsement. Compl. ¶ 42; *see also* Saab Decl., ¶ 14, Ex. 2 at 6–7. Any use outside the express scope of the license constitutes a breach of these unambiguous restrictions. Taken together, these allegations establish a prima facie case of Defendant's breach of Section 13(b).

**Finally**, Texas Precious Metals has suffered damages due to Defendant's breach (Compl. ¶¶ 127–128), which are ongoing and will continue absent injunctive relief. Saab Decl., ¶ 29.

All four elements for a breach of contract claim have been met.

B.    **Texas Precious Metals will succeed on its infringement and counterfeiting claims.**

The Complaint asserts claims for registered and unregistered trademark infringement under the Lanham Act, 15 U.S.C. § 1114, 1125, and moves herein for injunctive relief for infringement of the registered marks. *See* Compl. ¶¶ 70–89, 96–104. To prevail, Texas Precious Metals must establish that: (1) it owns valid, protectable trademarks; and (2) Defendant used one or more of those trademarks in U.S. commerce in a manner that is likely to cause confusion, mistake, or deception among consumers. 15 U.S.C. § 1114(1), 1125(a)(1)(A); *Applied Info. Scis. Corp. v. eBAY, Inc.*, 511 F.3d 966, 969 (9th Cir. 2007).

The Complaint also asserts a claim for counterfeiting, which is a type of infringement involving the use of a "counterfeit." The Lanham Act defines a "counterfeit" as a "spurious mark which is identical with, or substantially indistinguishable from," a registered mark. 15 U.S.C. § 1127; *see also* 15 U.S.C. § 1116(d). To prevail on this claim, Texas Precious Metals must demonstrate that: (1) it owns a valid, federally registered trademark; and (2) Defendant used an identical or substantially indistinguishable mark on "spurious" goods—*i.e.*, precious metals products that do not originate with Texas Precious Metals. *Id.*; *see also* 15 U.S.C. § 1116(d)(1)(B)(i); *UL LLC v. Space Chariot Inc.*, 250 F. Supp. 3d 596, 607 (C.D. Cal. 2017).

Texas Precious Metals is well-positioned to satisfy these elements and succeed on its claims for trademark infringement and counterfeiting.

1.    **Texas Precious Metals owns valid, protectable trademarks.**

As alleged in the Complaint (Compl. ¶¶ 17–26), Texas Precious Metals owns valid and

protectable registered trademarks for its precious metals business.

Texas Precious Metals owns eight federal trademark registrations relevant to this dispute: U.S. Reg. Nos. 4404997, 4788152, 5076058, 5113004, 5113005, 6031097, 6031098, and 6031099 (the TPM Marks). *See* Saab Decl., ¶ 9; *see also* Iverson Decl., ¶¶ 2–10, Ex. 1. TPM's Principal Register registrations constitute *prima facie* evidence of the validity of each registered mark, of TPM's ownership of each mark, and of TPM's exclusive right to use each mark in commerce for the goods and services specified in the registration. 15 U.S.C. § 1115(a); *Tie Tech, Inc. v. Kinedyne Corp.*, 296 F.3d 778, 782–83 (9th Cir. 2002); *PetConnect Rescue, Inc. v. Salinas*, 656 F. Supp. 3d 1131, 1157 (S.D. Cal. 2023). For the four registrations that are incontestable (U.S. Reg. Nos. 4788152, 5076058, 5113004, and 5113005), those presumptions are *conclusive*, subject only to the nine enumerated defenses in 15 U.S.C. § 1115(b). *See Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1047 n.10 (9th Cir. 1999). Thus, Texas Precious Metals is likely to establish that the TPM Marks are valid and protectable for purposes of this Motion.

Texas Precious Metals is likely to establish the first element of its trademark infringement claims: ownership of valid, protectable trademarks.

### 2. Defendant used multiple trademarks in commerce in a manner likely to confuse, mislead, or deceive consumers.

Texas Precious Metals must also show that Defendant used one or more TPM Marks in commerce in a manner that is likely to confuse, mislead, or deceive consumers into believing that the Counterfeit Products originated with, are affiliated with, or are approved by TPM.

*First*, Defendant's conduct constitutes "use in commerce." The Lanham Act defines "commerce" as "all commerce which may lawfully be regulated by Congress," and provides that a mark is "used in commerce" on goods when it is placed on the goods or their displays and the goods are sold or transported in commerce. 15 U.S.C. § 1127. Here Defendant affixed the TPM Marks onto the Counterfeit Products, including that each Counterfeit Product: (a) features the Silhouette Mark as a mint mark and watermark; and (b) incorporates other Texas-themed design elements that are identical or confusingly similar to the TPM's marks, including the Rotunda Mark

13

and imagery from the Capitol Marks. Compl. ¶¶ 61–63. Defendant sold the Counterfeit Products (Compl. ¶¶ 3–6, 45–69) and they are currently offered for sale through TPM's competitor, USGB, satisfying the requirement that the goods be sold in commerce. Saab Decl. ¶ 16; Iverson Decl., ¶ 11, Ex. 6. The evidence also establishes that the Counterfeit Products are transported in interstate commerce, since Defendant is a Delaware corporation headquartered in Oregon, and USGB is a Texas limited liability company headquartered in Texas. Compl. ¶ 14; *see also* Iverson Decl., ¶¶ 12–13, Exs. 7–10. Therefore, Defendant used the TPM Marks "in commerce" under the Lanham Act.

**Second**, Defendant's activities are likely to confuse, mislead, or deceive consumers into believing the Counterfeit Products originate with, are affiliated with, or are endorsed by Texas Precious Metals for the reasons set forth below.

    a.    Counterfeiting gives rise to a presumption of likely confusion.

In ordinary infringement cases, courts in the Ninth Circuit consider the eight non-exclusive factors articulated in *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir. 1979) (the "**Sleekcraft Factors**"). However, that analysis is not required if the infringement involves *counterfeit* marks, because counterfeiting claims give rise to a *presumption* of likelihood of confusion. *GS Holistic, LLC v. Bubbles Smoke Shop*, No. CV233391MWFMRWX, 2023 WL 6787773, at *5 (C.D. Cal. Sept. 5, 2023) (citing *Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*, 658 F.3d 936, 945 (9th Cir. 2011)); *see also Microsoft Corp. v. Buy More, Inc.*, 703 F. App'x 476, 479 (9th Cir. 2017).

Defendant's infringement constitutes counterfeiting, which occurs when: (1) Defendant intentionally uses a counterfeit (*i.e.*, a non-genuine, identical or substantially indistinguishable reproduction of a registered mark) in commerce;[2] (2) knowing the mark is counterfeit; (3) in connection with the sale, offering for sale, or distribution of the same types of goods or services that are covered in a trademark registration on the USPTO's Principal Register; and (4) in a manner likely to confuse or deceive. *See State of Idaho Potato Comm'n v. G & T Terminal Packaging,*

---

[2] *See* 15 U.S.C. § 1127 (defining a "counterfeit" as "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark").

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

*Inc.*, 425 F.3d 708, 721 (9th Cir. 2005). Counterfeit goods or services need not be *exact replicas* of existing products, but rather, must be the same types of goods or services identified for the trademark registrations. *Y.Y.G.M. SA v. Redbubble, Inc.*, 75 F.4th 995, 1004 (9th Cir. 2023).

Here, Defendant reproduced spurious, identical or "substantially indistinguishable" copies of the TPM Marks—including the Silhouette Mark, which is the subject of two incontestable trademark registrations, U.S. Reg. Nos. 5113004 and 5113005—onto the Counterfeit Products. *See* Saab Decl., ¶ 18. Defendant did so intentionally and with full knowledge that the marks are registered, having expressly acknowledged as much in the Sales Agreement. Saab Decl., ¶¶ 13–14. Further, Defendant knew that TPM had not authorized—and expressly objected to—their use on competing products. *Id.*, ¶¶ 24–26. Yet, it deliberately used these marks on precious metals products and in connection with related services. Compl. ¶¶ 46–47, 50, 61–63; Saab Decl., ¶¶ 18–19; Iverson Decl., ¶ 11, Ex. 6. These goods and services overlap with what are covered by TPM's incontestable registrations for the Silhouette Mark, including the Counterfeit Products, which are Class 14 "precious metals." *See* Iverson Decl., ¶ 6, Ex. 1; *see also* Saab Decl., ¶ 19 (explaining how companies in the industry promote gold notes as precious metals products with value based on their precious metal content). When offered the opportunity to correct the infringement by procuring a retroactive license from Texas Precious Metals, Defendant declined and proceeded to manufacture, sell, promote, and distribute the Counterfeit Products over TPM's objections. Saab Decl., ¶¶ 27–28. For example, the Silhouette Mark appears on each of the Counterfeit Products in a location that can be seen as a mint mark, as shown here:



15

Differences between TPM's Silhouette Mark and the spurious mark on Defendant's Counterfeit Products, if any, would not be recognized by ordinary consumers. *Id.*, ¶ 29. Because TPM's registrations do not claim color as a feature, variations in color, shading, or contrast are immaterial. Moreover, on metal products, the mark is not "colored" at all but created by stamping the design into the surface, producing raised or recessed impressions that may appear lighter or darker depending on lighting and angle. This is seen, for instance, in TPM's silver bars, below.



Accordingly, Defendant's use of materially identical silhouettes falls well within the scope of TPM's protected marks and is likely to be perceived by consumers as indicating source.

The record also demonstrates intent to confuse, given that Defendant expressly agreed that:

- The five "TPM Trademarks" in the Sales Agreement are Texas Precious Metals' sole and exclusive property (Saab Decl., ¶¶ 13–14, Ex. 2 at 6, 16); and

- It would not use the TPM Trademarks on any products other than the TPM-branded products authorized under the Sales Agreement (*id.*).

Despite those commitments, Defendant continued producing Counterfeit Products *after* TPM objected in November, *after* Defendant rejected a licensing proposal, and *even after* this case was filed (Compl. ¶¶ 5, 47–58; Saab Decl., ¶¶ 24–28, Exs. 3–4). For at least the five "TPM Trademarks" listed in the Sales Agreement, TPM is entitled to a presumption of likelihood of confusion and need not satisfy the *Sleekcraft* multi-factor analysis.

  b. <u>The *Sleekcraft* Factors confirm likely confusion as to the other TPM Marks.</u>

As an independent ground for all Texas Precious Metals' registered trademarks, likelihood of confusion in the Ninth Circuit is evaluated under the eight *Sleekcraft* Factors, namely: (1) the

strength of Texas Precious Metals' asserted trademarks; (2) the relatedness and proximity of the parties' respective goods; (3) the similarity of the trademarks used by each party; (4) whether there is evidence of actual confusion among consumers; (5) whether the parties use similar trade and marketing channels; (6) the type of goods at issue and the degree of care likely to be exercised by purchasers; (7) whether Defendant began using the marks at issue with the intent to infringe; and (8) the likelihood that either party will expand its product lines in the future. *AMF Inc.*, 599 F.2d at 348–49. The Factors are "pliant," meaning that some are much more important than others, and the relative importance of each individual factor is case-specific. *Brookfield Comm's*, 174 F.3d at 1054. While factors such as the similarity of the marks and the competitive proximity of the parties are often critical, courts may reach a likelihood-of-confusion determination after considering only a subset of the factors. *Id.* (citing *Dreamwerks Prod. Grp., Inc. v. SKG Studio*, 142 F.3d 1127, 1130–32 (9th Cir. 1998)). Texas Precious Metals need not prevail on every Factor so long as it makes strong showings on the most important ones. *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1125 (9th Cir. 2014) (citing *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 631 (9th Cir. 2005)). Here, the core Factors overwhelmingly favor Texas Precious Metals.

### *(1)    Strength of the TPM Marks.*

"The scope of a mark's trademark protection depends on its strength, 'with stronger marks receiving greater protection than weak ones.'" *Pom Wonderful LLC*, 775 F.3d at 1126 (quoting *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1141 (9th Cir. 2002)); *see also Brookfield*, 174 F.3d at 1058. In this case, several TPM Marks are the subject of federal trademark registrations, four of which are incontestable. *See* Iverson Decl., ¶¶ 2–10, Ex. 1. The TPM Marks also have significant commercial strength as a result of TPM's significant sales and advertising involving the TPM Marks. As noted previously, the TPM Marks have been used in connection with over 200,000 customer transactions nationwide, across all 50 states, generating total revenues in excess of $4 billion. Saab Decl., ¶ 10; *see also* Compl. ¶¶ 16–17, 26. In addition, from 2011 to 2015, Texas Precious Metals spent over $1.2 million developing its online retail website, advertising its products and services in print and online, and obtaining custom packaging and materials bearing

17

the TPM Marks, and it has spent approximately $350,000 or more per year on these activities since 2016. *Id.*, ¶ 30. This includes, for instance, a monthly full-page advertisement in the Texas Co-op Power Magazine, a publication with a circulation of over 1.2 million people. The marks are used uniformly across TPM products, including the Silhouette Mark, evident throughout TPM's public-facing materials. *Id.*, ¶ 31, Ex. 11 (screenshots from TPM's website).

Retailers consistently recognize both TPM's ownership of—and the strength of—these trademarks, describing them as "famous" and "iconic." *Id.*, ¶¶ 32–33. One such retailer, JM Bullion, promotes TPM's products as featuring "the outline of the state of Texas, a silhouette which is a registered trademark." *Id.*, ¶ 32, Ex. 12. According to JM Bullion, the Silhouette Mark is one of the "Famous Texas Mint design elements." *Id.* Similarly, another retailer, Bullion Max advertises TPM's products as having "famous Texas Mint design elements" including a reverse that "includes the repeating silhouette of the State of Texas." *Id.*, ¶ 33, Ex. 13. In January 2022, the precious metals retailer GSI Exchange described one of TPM's products as featuring "the trademarked silhouette of the Texas mint, their official mark." *Id.*, Ex. 14. Yet another retailer, LPM Group Limited, has stated that the presence on TPM's products of its "iconic Texas Mint mark, a trademarked silhouette . . . guarantee[s] its authenticity and quality." *Id.*, Ex. 15.

Media coverage within the precious metals industry likewise confirms both the strength and longstanding use of the TPM Marks. In a 2024 article regarding an earlier TPM lawsuit, VitalLaw described TPM's business as one that "has produced, marketed, and sold precious metal products under its 'Texas Silhouette Marks' since at least 2011," accounting for transactions involving "more than 2351 metric tons of gold and silver" across over 150,000 orders. *Id.*, ¶ 34, Ex. 16. The article separately identified the Silhouette Mark as a "TPM registered . . . image mark" and noted its "incontestability." *Id.* Similarly, a 2017 feature on Texas Precious Metals highlighted the company's rapid growth and described its products as prominently displaying "[t]he trademarked outline of Texas," noting that it appears on both sides of certain TPM products. *Id.*, ¶ 35, Ex. 17.

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

This consistent branding is effective: customers regularly recognize and refer to the TPM Marks in communications with the company. *See id.*, ¶ 36, Ex. 18 (a customer correctly identifying the Silhouette Mark as a TPM trademark by stating, "And your logo is the Texas in a circle."); Ex. 19 (referring to "those goldbacks . . . that had the Texas on it."). TPM's sustained, nationwide use of the TPM Marks, and the demonstrated consumer recognition of them, establish that the TPM Marks—particularly the TPM Marks—are commercially strong and closely associated with Texas Precious Metals.

### (2)    *Relatedness and proximity of the products.*

Goods are proximate if they are "similar in use and function" and "would be reasonably thought by the buying public to come from the same source if sold under the same mark." *AMF Inc.*, 599 F.2d at 350 (citing *Commc'ns Satellite Corp. v. Comcet, Inc.*, 429 F.2d 1245, 1253 (4th Cir. 1970)). Here, Defendant does not merely offer *similar* goods. Rather, the Counterfeit Products are: (a) the *exact same* types of goods covered by multiple registered TPM Marks (precious metals products, and specifically precious metals notes); (b) positioned to compete directly with Texas Precious Metals in the same emerging market as the products authorized by the Sales Agreement; and (c) marketed and sold to the same target purchasers via the same trade channels utilized by Texas Precious Metals. Saab Decl. ¶¶ 19–22. The Ninth Circuit has made clear that "[i]n light of the virtual identity of marks, if they were used with identical products or services likelihood of confusion would follow as a matter of course." *Brookfield*, 174 F.3d at 1056; *see also UL LLC*, 250 F. Supp. 3d at 610. This factor therefore strongly favors TPM.

### (3)    *Similarity of the marks and overall commercial impression.*

Defendant did not merely adopt marks that are *similar* to the TPM Marks. Instead, it uses *counterfeit*s—identical or substantially indistinguishable replicas of the TPM Marks, including registrations expressly identified in the Sales Agreement. The Counterfeit Products display the Silhouette Mark as both a mint mark and a watermark, and they incorporate other TPM Marks (or confusingly similar variants) in the same source-identifying manner used by Texas Precious Metals on its own products. Compl. ¶¶ 61–63; Saab Decl., ¶ 18; Iverson Decl., ¶ 11, Ex. 6. Where

virtually identical marks are used on virtually identical goods, likelihood of confusion follows "as a matter of course." *Brookfield*, 174 F.3d at 1056.

The overall commercial impression created by Defendant's use of trademarks that are identical to or substantially the same as the TPM Marks unmistakably points to Texas Precious Metals—a *Texas*-based entity that prominently uses *Texas*-themed imagery, including its Silhouette Mark, the Capitol Marks, and the Rotunda Mark—to indicate the source of its goods. The Counterfeit Products replicate that same visual language: the distinctive silhouette of the State of Texas (an immediately recognizable shape) appears multiple times on each Counterfeit Product, including as a mint mark in the lower left portion of the note and as a background watermark.

 

Notably, the Texas silhouette is placed in a *location* and at a *size* consistent with where consumers could expect to see a designation of origin, as demonstrated by the following images of the Counterfeit Products alongside examples of other products with similar mint mark or Federal Reserve source indicators (circled in red):

 

 

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

The Counterfeit Products also incorporate TPM's registered Rotunda and Capitol imagery, including a full-note Rotunda design overlaid with an oblique view of the Capitol building (with blue outline added, below)—both of which are themselves TPM Marks. *See* Iverson Decl., ¶¶ 9–10, Ex. 1.

 

In total, multiple TPM Marks appear on each Counterfeit Product, including *four* times on the 20-centigram note. Taken together, this pervasive use of TPM's marks creates a commercial impression that the Counterfeit Products originate with, or are authorized by, Texas Precious Metals.

### (4)    *Actual confusion has already occurred.*

Evidence of actual confusion is not required but strongly supports a likelihood of confusion. *See Am. Int'l Grp., Inc. v. Am. Int'l Bank*, 926 F.2d 829 (9th Cir. 1991). As the name of the test reflects, the inquiry is whether confusion is *likely*, not whether it has *already occurred*. *See Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1145 (9th Cir. 2011) (explaining the *Sleekcraft* Factors are not a rote checklist). Courts also recognize "[p]roving actual confusion is difficult" and evaluate such evidence accordingly. *Id.* at 1151.

In this case, although the Counterfeit Products have only been on the market for a few months at most, there have already been several instances of actual consumer confusion, as demonstrated by customer calls and social media discussions. This evidence is particularly probative because it arose within a short time period, as the Counterfeit Products were just announced on December 29, 2025, and became available for purchase in 2026 (Iverson Decl., ¶

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

14, Ex. 20), and the evidence is high-quality: Customers clearly express their confusion, eliminating the need for inference.

Customer communications show that confusion began to occur immediately after the Counterfeit Products were publicly announced. Saab Decl., ¶ 38. On December 29, 2025—the same day of the announcement—a customer contacted TPM believing the Counterfeit Products were a TPM product and asking whether TPM was involved in creating "paper money" with the State of Texas. *Id.*, Ex. 21. The following day, another customer, prompted by publicity for the Counterfeit Products, contacted TPM asking if they were "the same thing" as TPM's gold notes. *Id.*, ¶ 39, Ex. 22. Several other customers have called TPM believing they had reached the Texas Bullion Depository, whose name appears on the Counterfeit Products, and attempted to purchase those products through TPM. *Id.*, ¶ 40, Ex. 23.

Discussions on social media further reflect the same confusion regarding Defendant's Counterfeit Products. A Facebook community exists called "Goldback Traders," which is "a place to discuss and trade goldbacks." Iverson Decl. ¶15, Ex. 29. TPM offers a Dallas-Fort Worth gold note that indicates on its face it is "powered by Goldback" and exchangeable for one Goldback; this product is regularly discussed in the "Goldbacks Traders" Facebook community. Saab Decl., ¶ 4; Iverson Decl. ¶15, Ex. 29. In the "Goldbacks Traders" Facebook community, users posted images of Counterfeit Products without distinguishing them from products like TPM's authentic gold notes. Saab Decl., ¶ 41, Ex. 24. Other users responded by sharing images of gold notes that they claimed to have recently received, evidently believing that the *Counterfeit Products* were part of the same product category. *Id.*, ¶ 42, Ex. 25. This is not an isolated incident. Other members of the Goldbacks Traders community have since posted additional images of Counterfeit Products. *Id.*, ¶ 43, Ex. 26. Notably, the moderators of the Goldbacks Traders community have not removed or corrected these posts and the discussions remain active on the Goldbacks Traders forum, indicating that the confusion persists to this day, even among consumers who demonstrate particular interest in and routinely discuss these products. *Id.*, ¶ 44.

Taken together, this evidence demonstrates actual confusion in the marketplace and strongly supports a finding that confusion is likely.

### (5)    *Overlapping marketing channels.*

"Convergent marketing channels increase the likelihood of confusion." *Off. Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1393 (9th Cir. 1993). This factor is important because if the parties utilize the same trade channels, it increases the likelihood that consumers will encounter their respective marks in circumstances likely to cause confusion, mistake, or deception. *See, e.g., GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1207 (9th Cir. 2000).

Here, TPM and Defendant use the same marketing channels to promote and sell their products, including their websites and shared networks of precious metals distributors and retailers. Saab Decl., ¶¶ 21, 45. Retailers carrying TPM's authentic gold notes *and* Defendant's Counterfeit Products have promoted and displayed them together as "related products." *Id.*, ¶ 45. For example, APMEX offers the Counterfeit Products immediately adjacent to the authentic, Dallas-Fort Worth gold notes authorized under the Sales Agreement, as shown below:



| 2025 20 Centigram Gold Aurum Texas: State Capitol | 2025 5 Centigram Gold Aurum Texas: Longhorn Steer | 1 Dallas Fort Worth Texas Goldback Gold Note 24K | 2025 100 Centigram Gold Aurum Texas: The Alamo |
|---|---|---|---|
| $63.85 | $15.89 | $10.35 | $319.23 |
| Any Qty | Any Qty | Any Qty | Any Qty |

*Id.*, ¶ 46, <u>Ex. 27</u>. In addition, searches for the phrase "Texas Precious Metals" on the websites of precious metals retailers such as APMEX and Finest Known yield results for *both* TPM's authentic products *and* the Counterfeit Products. *Id.*, ¶ 47, <u>Ex. 28</u>. Consumers thus encounter Defendant's unauthorized uses of the TPM Marks in the same channels where authentic Texas Precious Metals products are offered, making confusion likely. This factor therefore favors Texas Precious Metals.

### (6) Degree of purchaser care.

Likelihood of confusion is evaluated from the perspective of a "reasonably prudent consumer." *Hokto Kinoko Co. v. Concord Farms, Inc.*, 810 F. Supp. 2d 1013, 1030 (C.D. Cal. 2011) (quoting *Brookfield*, 174 F.3d at 1060).

In the precious metals market, purchasers rely heavily on mint marks and other source identifiers to assess the authenticity and quality of products. Saab Decl., ¶¶ 7–8. It is unrealistic to expect ordinary consumers to distinguish Defendant's Counterfeit Products from an authentic TPM product (*e.g.*, the authentic, TPM-branded gold notes authorized under the Sales Agreement), given that Defendant's products: (a) use the Silhouette Mark as a mint mark; (b) appear within a relatively new product category within the industry (gold notes), less familiar to consumers; (c) are sold through the same retailers that sell TPM products; and (d) are marketed by those retailers as being "related to" TPM's offerings, including in response to search queries for the phrase "Texas Precious Metals." *See id.*, ¶¶ 18, 20–21, 45–47, Exs. 27–28.

The risk of confusion is even greater in the secondary market, where purchasers often acquire precious metals products directly from individual resellers. *Id.*, ¶ 48. In these transactions, consumers typically lack access to source-identifying information beyond the product itself or its trusted mint mark—there are no branded storefronts, company representatives, affiliated distributors, or supporting websites with information about the specific product being sold. *Id.* Because most purchasers lack the tools or expertise necessary to independently authenticate such products on their own, they must rely on limited and imperfect information when making purchasing decisions, with the mint mark serving as the primary and often most reliable indicator of quality, source, and authenticity. *Id.* Accordingly, the degree-of-care factor also supports a finding of likely confusion.

### (7) Defendant's knowledge and deliberate adoption.

Texas Precious Metals need not prove that Defendant intended to confuse consumers, as trademark infringement is a strict liability offense. *See GoTo.com, Inc.*, 202 F.3d at 1208. Nevertheless, where the record shows intentional adoption of another's mark, that evidence

24

**strongly supports** a likelihood of confusion. *U-Haul Int'l, Inc. v. Jartran, Inc.*, 793 F.2d 1034, 1041 (9th Cir. 1986) ("The expenditure by a competitor of substantial funds in an effort to deceive consumers and influence their purchasing decisions justifies the existence of a presumption that consumers are, in fact, being deceived."). Indeed, "[w]hen an alleged infringer knowingly adopts a mark similar to another's, courts will presume an intent to deceive the public." *Off. Airline Guides, Inc.*, 6 F.3d at 1394.

This is not a case of coincidental similarity. Defendant had both actual and constructive notice of the TPM Marks prior to producing the Counterfeit Products, and yet, it proceeded to use them on the Counterfeit Products without authorization from—and over objections from—TPM. Defendant expressly acknowledged in the Sales Agreement that Texas Precious Metals is the "sole and exclusive" owner of the five "TPM Trademarks" and agreed not to use identical or confusingly similar marks outside the Agreement's limited license. Compl. ¶¶ 2, 41–42, 66, 85; Saab Decl., ¶¶ 13–14, Ex. 2 at 5–7. Despite that acknowledgment, Defendant manufactured and sold the Counterfeit Products *after* Texas Precious Metals objected, *after* rejecting the offer of a retroactive license, and *even after* this case was filed. Compl. ¶¶ 2, 41–42, 66, 85; Saab Decl., ¶¶ 24–28, Exs. 3–4. That Defendant removed one instance of the Silhouette Mark from the Counterfeit Products confirms it was aware the use was improper, it had the ability and discretion to alter the Products' design, and it has no plausible claim of good faith. Compl. ¶¶ 50–52; Saab Decl., ¶ 25, Ex. 3. Defendant also had *constructive* notice of the TPM Marks by virtue of their registration on the USPTO's Principal Register. *See* 15 U.S.C. § 1072. This factor therefore strongly favors Texas Precious Metals.

### (8)    *Likelihood of expansion of product lines or markets.*

The final *Sleekcraft* Factor addresses "the potential for confusion that may arise if the parties expand, or are likely to expand, into each other's markets." *M'Otto Enters., Inc. v. Redsand, Inc.*, 831 F. Supp. 1491, 1504 (W.D. Wash. 1993). A "strong possibility" that either party may expand its business to compete with the other weighs in favor of likely confusion. *AMF Inc.*, 599 F.2d at 354. However, in cases like this, where the parties already operate in the same market,

25

offer the same goods, and target the same consumers, "expansion is not only a 'likelihood' but is virtually guaranteed," further increasing the risk of confusion. *Id.*; *see also Diller v. Barry Driller, Inc.*, No. CV 12-7200 ABC EX, 2012 WL 4044732, at *8 (C.D. Cal. Sept. 10, 2012).

In sum, the *Sleekcraft* Factors—together with the presumption arising from Defendant's counterfeiting—confirm a likelihood of confusion arising from Defendant's unauthorized use of the TPM Marks. Any remaining doubt must be resolved in TPM's favor, as Defendant, the newcomer, had both the opportunity and the obligation to enter the market without infringing TPM's trademarks. *See Dr. Seuss Enters., L.P. v. Penguin Books USA*, 109 F.3d 1394, 1401 (9th Cir. 1997). TPM is therefore likely to succeed on its infringement and counterfeiting claims.

## C. **Texas Precious Metals will suffer irreparable harm absent injunctive relief.**

### 1.    **Texas Precious Metals is entitled to a presumption of irreparable harm.**

The Trademark Modernization Act of 2020 updated the Lanham Act to provide that the plaintiff in a trademark infringement case is entitled to a rebuttable presumption of irreparable harm upon a showing of likelihood of success on the merits. 15 U.S.C. § 1116(a); *see also BGC Inc. v. Robinson*, No. 22-CV-01582-JSW, 2022 WL 2915703, at *4 (N.D. Cal. July 25, 2022). Even apart from this statutory presumption, the Ninth Circuit has long recognized that loss of control over business reputation and damage to goodwill constitute irreparable harm. *See 2Die4Kourt v. Hillair Cap. Mgmt., LLC*, 692 F. App'x 366, 369 (9th Cir. 2017).

For more than fifteen years, Texas Precious Metals has invested substantial resources to build nationwide recognition and goodwill in a cohesive family of Texas-themed trademarks, which consumers uniquely and unmistakably associate with Texas Precious Metals. *See supra* at Sec. IV(B); Compl. ¶¶ 18–20, 30–33. Defendant's sale of the Counterfeit Products undermines TPM's ability to control the use of its marks, resulting in loss of goodwill and damage to its reputation—harms that are irreparable and inherently difficult to quantify. *See Neighborhood Assistance Corp. of Am. v. First One Lending Corp.*, No. SACV 12-463 DOC MLGX, 2012 WL 1698368, at *6 (C.D. Cal. May 15, 2012). The risk of harm is particularly acute here, where the

products at issue occupy a new product category within the industry, increasing consumers' reliance on trusted source identifiers, such as mint marks, as assurances of quality, purity, and value. *Supra*; Saab Decl., ¶ 4; Compl. ¶ 35. And now, as of March 20, 2026, it appears through Facebook comments that the products have begun to reach actual consumers. *See* Saab Decl., ¶¶ 41–43, Exs. 24–26.

        2.        **The Sales Agreement confirms the inadequacy of legal remedies.**

The Sales Agreement independently confirms the immediacy and irreparability of the harm at issue and serves as Defendant's express admission of the same. Courts routinely give weight to contractual acknowledgements that harm from intellectual property violations is irreparable and not compensable by monetary damages. *See, e.g.*, *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 49 (2d Cir. 1999); *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999).

Here, Defendant acknowledged that the "TPM Trademarks" identified in the Sales Agreement are the "sole and exclusive" property of Texas Precious Metals and agreed that any unauthorized use of those marks would result in harm for which there is "no adequate remedy at law," expressly providing for "temporary, preliminary, and permanent injunctive relief" in the event of a breach. *See* Saab Decl., ¶ 15, Ex. 2 at 12.

**D.**        <u>**The balance of equities tips sharply in Texas Precious Metals' favor.**</u>

In determining whether to grant injunctive relief, courts "must balance the competing claims of injury and consider the effect on each party of granting or withholding the requested relief." *Winter*, 555 U.S. at 24. Where the only hardship to a defendant is the loss of profits from infringement, that hardship carries little equitable weight. *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 924 F. Supp. 1559, 1574 (S.D. Cal. 1996); *Concrete Mach. Co. v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600, 612 (1st Cir. 1988). Thus, the "balance of hardships tips sharply" in plaintiff's favor where a defendant intentionally capitalizes on the plaintiff's trademark to divert customers, "all at the expense of [the plaintiff's] goodwill and reputation" because "[i]t is no

hardship to cease intentionally infringing someone else's trademark rights." *Diller*, 2012 WL 4044732, at *26–27.

TPM's Texas-themed trademarks are widely recognized source identifiers that consumers rely upon to authenticate products, assess quality, and determine origin—particularly in the active resale and secondary markets where these products circulate long after their initial sale. The Counterfeit Products prominently feature the TPM Marks, including marks that are the subject of incontestable federal trademark registrations. The resulting harm includes ongoing loss of control over TPM's goodwill, reputational injury, consumer confusion that persists through downstream resales, and lost present and future sales. *See* Compl. ¶¶ 86–87, 93, 100–103, 109, 117, 128.

Granting this Motion imposes no cognizable hardship on Defendant, as it would merely need to stop profiting from infringing conduct, and a defendant cannot claim hardship from being required to comply with the law. *See Warner Bros. Ent. Inc. v. WTV Sys., Inc.*, 824 F. Supp. 2d 1003, 1014–15 (C.D. Cal. 2011). The Sales Agreement reinforces this conclusion, as Defendant agreed there would be "no adequate remedy at law" for infringement and that injunctive relief would be appropriate if it occurred. *See* Saab Decl. ¶ 16, Ex. 2 at 12.

Equity favors holding Defendant to the contractual terms it negotiated. Because Texas Precious Metals is likely to succeed on its infringement, counterfeiting, and breach-of-contract claims, the balance of equities strongly favors injunctive relief.

E.      **The public interest favors preliminary relief.**

"A plaintiff seeking an injunction must establish that the injunction is in the public interest." *Internet Specialties W., Inc. v. Milon-DiGiorgio Enters., Inc.*, 559 F.3d 985, 993 (9th Cir. 2009). In trademark cases, this inquiry focuses on the public's interest in avoiding confusion and deception. *Moroccanoil, Inc. v. Moroccan Gold, LLC*, 590 F. Supp. 2d 1271, 1282 (C.D. Cal. 2008) ("By using confusingly similar marks, a defendant deprives consumers of their ability to distinguish among the goods of competing manufacturers."). Thus, a preliminary injunction that prevents consumer confusion serves the public interest. *See Faizi v. Temori*, No. 22-CV-04224-

VKD, 2022 WL 7094259, at *21 (N.D. Cal. Oct. 12, 2022); *Am. Rena Int'l Corp. v. Sis-Joyce Int'l Co.*, 534 F. App'x 633, 636 (9th Cir. 2013); *AECOM Energy & Constr., Inc. v. Morrison Knudsen Corp.*, 748 F. App'x 115, 120 (9th Cir. 2018). Here, Texas Precious Metals has shown that Defendant's use of the TPM Marks and confusingly similar variations breaches the Sales Agreement and is likely to confuse consumers. Because injunctive relief will protect consumers and promote fair competition, the public interest strongly favors granting the requested relief.

**F.      The Court should dispense with any bond requirement or, at most, require only nominal security.**

Fed. R. Civ. P. 65(c) provides that "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." However, it is well-settled that courts have broad equitable discretion to determine both the amount of any bond and whether a bond is required at all. *Faizi*, 2022 WL 7094259, at *22 (requiring only a $1,000 bond per restaurant location). Where there is no evidence that the enjoined party will suffer compensable monetary harm, a bond may be set at zero. *Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003); *Jorgensen*, 320 F.3d at 919.

Here, the only "harm" Defendant would face from an injunction is the inability to profit from conduct that is contractually prohibited and infringing. Defendant expressly agreed that there would be "no adequate remedy at law" for a breach of Section 13(b) of the Sales Agreement, and that Texas Precious Metals would be entitled to injunctive relief "without proof of any actual or special damages and without the need to post any bond." Compl. ¶ 43; Saab Decl. ¶ 16, Ex. 2 at 12. Therefore, Texas Precious Metals respectfully requests that the Court waive the security requirement under Fed. R. Civ. P. 65(c), consistent with the "no bond" provision. Alternatively, if the Court determines that some security is appropriate, TPM requests that it require only nominal security. *See GoTo.com, Inc.*, 202 F.3d at 1211; *Faizi*, 2022 WL 7094259, at *8.

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

## V.    CONCLUSION

For the reasons set forth above, Texas Precious Metals respectfully requests that the Court grant its Motion for Preliminary Injunction and order the requested relief.

Dated: March 20, 2026

Respectfully submitted,

*/s/ Steven Tepera*

Michael E. Zeliger (CA Bar No. 271118)
michael.zeliger@pillsburylaw.com
Steven Tepera (TX Bar No. 24053510)
steven.tepera@pillsburylaw.com
Jon Jekel (CA Bar No. 298646)
jon.jekel@pillsburylaw.com
Ryan Sullivan (TX Bar No. 24102548)
ryan.sullivan@pillsburylaw.com
Sam E. Iverson (NY Bar No. 6212468) *(pro hac vice forthcoming)*
sam.iverson@pillsburylaw.com
PILLSBURY    WINTHROP    SHAW PITTMAN LLP
401 West 4th Street, Suite 3200
Austin, TX 78701
512.580.9600

Kenneth R. Davis, II, OSB No. 971132
daviskr@ballardspahr.com
Mohammed N. Workicho, OSB No. 186140
workichom@ballardspahr.com
BALLARD SPAHR LLP
601 S.W. Second Avenue, Suite 2100
Portland, Oregon 97204
Telephone: 503.778.2100

*Attorneys for Texas Precious Metals, LLC*

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION