# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **TEXAS PRECIOUS METALS, LLC**, | Case No. 3:26-cv-157-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **VALAURUM, INC.**, | |
| Defendant. | |

Shannon Zmud Teicher and Carl C. Butzer, JACKSON WALKER LLP, 2323 Ross Avenue, Suite 600, Dallas, TX 75201; Tori C. Emery, JACKSON WALKER LLP, 1401 McKinney Street, Suite 1900, Houston, TX 77010; and Kenneth R. Davis, II and Mohammed N. Workicho, BALLARD SPAHR LLP, 601 SW Second Avenue, Suite 2100, Portland OR 97204. Of Attorneys for Plaintiff, Texas Precious Metals, LLC.

Delfina S. Homen and Christopher J. Riley, MILLER NASH LLP, 1140 SW Washington Street, Suite 700, Portland, OR 97205; and James H. Creedon, SCALE LLP, 5 Cowboys Way, Suite 300, Frisco, TX 75034. Of Attorneys for Defendant, Valaurum, Inc.

**Michael H. Simon, District Judge.**

Plaintiff, Texas Precious Metals, LLC ("TPM"), is a Texas-based company that buys and sells precious metals nationwide. TPM has registered multiple trademarks containing Texas-themed imagery, including three marks of the silhouette of the state of Texas. Defendant, Valaurum, Inc. ("Valaurum"), also deals in precious metals. Valaurum contracted with a third

PAGE 1 – OPINION AND ORDER

party to produce gold notes containing Texas-themed images that TPM alleges are similar to its marks. TPM and Valaurum also entered into a contract with each other.

In January 2026, TPM filed a complaint against Valaurum, alleging both statutory trademark violations and breach of contract. ECF 1. Now before the Court are the following four motions: (1) TPM's motion for preliminary injunction (ECF 24); (2) TPM's motion for leave to file an amended complaint (ECF 57); (3) TPM's motion to dismiss several of Valaurum's affirmative defenses and counterclaims (ECF 30); and (4) Valaurum's motion to stay this lawsuit (ECF 31). On July 2, 2026, the Court held an evidentiary hearing. For the reasons explained below, the Court denies TPM's motion for preliminary injunction, grants TPM's motion for leave to file an amended complaint, denies as moot TPM's motion to dismiss several of Valaurum's affirmative defenses and counterclaims, and denies Valaurum's motion to stay. Regarding TPM's motion for preliminary injunction, TPM has not shown that it is likely to prevail on its claims because Valaurum's products do not contain imagery likely to cause consumer confusion.

## BACKGROUND[1]

TPM and Valaurum each produce gold notes. A gold note is "a flexible polymer product akin to a bank note containing certain amounts of gold indicated by the denomination of the product." ECF 24 at 9. In addition to gold notes, TPM specializes in the production of gold, silver, and platinum products featuring Texas-themed trademarks and imagery, including coins, bars, and "rounds." ECF 24-1 (Declaration of Tarek Saab) ¶ 3. This controversy arose when

---

[1] Regarding TPM's motion for preliminary injunction, the Court finds the facts stated below by a preponderance of the evidence.

PAGE 2 – OPINION AND ORDER

Valaurum began creating its own Texas-themed gold notes and, separately, contracted with TPM to manufacture gold notes with TPM's Texas-themed trademarks.

## A.  TPM's Trademarks

TPM maintains six trademarks that are relevant to this case: U.S. Registration Numbers 4404997, 5113004, 5113005, 6031097, 6031098, and 6031099. *See id.* ¶ 9.[2] Two of these registrations, 5113004 and 5113005, appear on the Principal Register of the U.S. Patent and Trademark Office ("USPTO"). ECF 24-2 ¶¶ 6-7. Both marks are silhouettes of the state of Texas ("Silhouette Marks"), and they have obtained incontestable status because they appear on the USPTO's Principal Register. *Id.* The USPTO initially refused registration for both marks on the Principal Register on the grounds that the marks were ornamental and lacked distinctiveness. *See* ECF 29-11 (Aug. 16, 2016, USPTO Rejection Letter); ECF 29-12 (Aug. 15, 2016, USPTO Rejection Letter); ECF 29-13 (Response); ECF 29-14 (Response). TPM later overcame that hurdle by providing "proof of substantially exclusive and continuous use" of the marks, arguing that they had "acquired distinctiveness as used in commerce with [TPM's] goods or services" under section 2(f) of the Trademark Act. *See* ECF 29-13 at 1; ECF 29-14 at 1 (same).

TPM also maintains four marks on the USPTO's Supplemental Register. The first registration, 4404997, also is a Silhouette Mark. ECF 24-2 ¶ 3; ECF 29 ¶ 4 & Ex. 2. The next two registrations, 6031097 and 6031098, feature an image of the Texas State Capitol inside a circle (the "Texas State Capitol Marks"). ECF 24-2 ¶¶ 8-9. The image in 6031097 includes a statue of a cowboy and a flower in the foreground, while the image in 6031098 contains the

---

[2] TPM has two other Texas-themed trademarks. *See* ECF 24-2 (Declaration of Sam E. Iverson) ¶¶ 4-5 (U.S. Reg. Nos. 4788152, 5076058). Although TPM briefly mentions these two marks in its motion for preliminary injunction, they are not substantively discussed in the briefing by either TPM or Valaurum. Accordingly, the Court does not discuss them further.

PAGE 3 – OPINION AND ORDER

dome of the Texas State Capitol and part of the façade of the Texas State Capitol building. *See id*. Finally, 6031099 is a two-dimensional, orthogonal image of the interior of the Texas State Capitol rotunda (the "Rotunda Mark," together with the Texas State Capitol Marks, the "Supplemental Register Marks."), similar to what a visitor to the Texas State Capitol building would see if the visitor stood in the middle of the rotunda and looked up, directly at the ceiling. *See id*. ¶ 10. USPTO refused to enter the Texas State Capitol Marks and the Rotunda Mark on the USPTO's Principal Register on the grounds that they were decorative or ornamental and lacked distinctiveness. ECF 29 ¶ 8 & Exs. 6-8.

TPM states that it has invested substantial time and money marketing its Texas-themed marks, which first appeared on TPM's products in 2011. ECF 24-1 ¶ 30. TPM spent more than $1.2 million developing its online retail website, advertising, and related materials; since 2015, TPM has spent approximately $350,000 annually on such items. *Id*. Market participants consistently recognize TPM's marks, and TPM has pointed to several examples of major retailers advertising TPM products containing the marks and describing the marks as "famous" and "iconic" while attributing them to TPM. *See id.* ¶¶ 32-33 & Exs. 12-15.

## B. Valaurum's Texas-Themed Notes

In 2023, the Acting Comptroller of the State of Texas issued a Request for Proposals for third-party contractors to assist the Texas Bullion Depository ("the Depository"), a state agency, in the production and sale of commemorative coins, notes, and related products. ECF 28 (Declaration of Adam Trexler) ¶ 2. In August 2024, the Acting Comptroller awarded a contract to Lone Star Tangible Assets, LP ("LSTA"), which later sub-contracted with Valaurum to produce gold notes. *Id*. ¶¶ 3-4.

Under its contract with LSTA, Valaurum produced gold notes with the denominations of 5, 20, and 100 centigrams (collectively, the "Depository Bills"). *See* ECF 28-1 (images of the

PAGE 4 – OPINION AND ORDER

Depository Bills). With LSTA's permission, Valaurum first introduced the Depository Bills in Palm Springs, California in June 2025. ECF 28 ¶ 10.

Each Depository Bill includes Texas-themed imagery. *See id*. ¶¶ 5-6 & Ex. 1. The front of each Depository Bill is different. ECF 28-1 at 3. Each denomination has a different background image, over which the words "Texas Bullion Depository" are superimposed prominently along the bottom edge of the bill. *See id.* at 1-6. The 20-centigram note features an image of the dome of the Texas State Capitol in the foreground on the right side of the note and, in the background, an image of an orthogonal view of the interior of the Texas State Capitol rotunda. *Id*. at 3. The 5- and 100-centigram notes contain other Texas-themed imagery. *See id*. at 1, 5.[3] The back of all three Depository Bills is identical except for the denomination. *See id*. at 2, 4, 6. In the center of each note is the "Lone Star" emblem—a five-pointed star with the letters T-E-X-A-S set between each point. *See id*. To the left of the star is the Texas Bullion Depository.gov logo, which includes a small outline of the state of Texas. *See id*. Also on the left-hand side of the note, behind both the star and the logo, is a faint depiction of the state of Texas "formed by fine, repeating linework and concentric design elements that create an 'echo' effect" (the "Echo Texas Design"). ECF 28 ¶ 7; ECF 28-1 at 2, 4, 6.

## C.  TPM and Valaurum's Business Discussions

On or about August 1, 2025, Dr. Adam Trexler (Valaurum's President) and Mr. Tarek Saab (TPM's CEO) met in person, during which Mr. Saab expressed to Dr. Trexler concerns about Valaurum's possible infringement of TPM's trademarks. ECF 28 ¶ 10. Valaurum asserts that Mr. Saab tried to get Dr. Trexler to enter into a licensing agreement for use of the relevant

---

[3] TPM does not allege that the front of the 5- or 100-centigram notes contain any infringing material.

marks. ECF 28 ¶ 10. Valaurum asserts that on July 16 and July 28, 2025, Dr. Trexler and Mr. Saab discussed the design of the Depository Bills by telephone. ECF 28 ¶ 10. TPM, however, denies that any of its representatives attended the Palm Springs event or had any conversation or knowledge of the Depository Bills before Dr. Trexler and Mr. Saab met in person in early August.[4] ECF 33-1 (Declaration of Tarek Saab) ¶¶ 3-4.

On August 4, 2025, Mr. Saab sent a draft agreement to Dr. Trexler proposing that Valaurum manufacture gold notes containing TPM's marks for a third party, Goldback, Inc. ("GBI"). ECF 33-1, Ex. 1, at 13-15. The email exchange between the two does not show that Valaurum assented to any agreement at that time but show that Dr. Trexler was at least open to the possibility of such an agreement. *See id.* at 14 ("Please let me [Dr. Trexler] know if those terms work for you . . . so we can get [the agreement] finalized before I'm out of the office."). The exchange also made clear that TPM believed that Valaurum could not use the marks without TPM's express permission, and TPM stated that it would not indemnify Valaurum for any unauthorized use of TPM's marks. *See id.*

## D. TPM and Valaurum's Sales Agreement

On September 25, 2025, TPM entered into a Sales Agreement with Valaurum and GBI. *See* ECF 24-1, Ex. 2. The agreement provides for Valaurum to manufacture a Texas-themed gold note featuring TPM's trademarks, with Section 12(a) of that contract granting Valaurum a limited license to use TPM's trademarks in connection with that agreement. *Id*. at 19. The contract contains two other sections material to this suit. Section 13(b) states, in relevant part:

> [Valaurum] will not design, develop, manufacture, market, distribute, or sell any product (a "Seller Product") that displays, includes, or incorporates any mark or symbol that is identical to, or

---

[4] TPM asserts that the meeting occurred on July 30, not August 1. This difference, however, is immaterial.

> confusingly similar to, any TPM Trademark when such mark or symbol is used as a source identifier, brand name, logo, or in any other manner that would constitute use of a TPM Trademark or create a likelihood of confusion, mistake, or deception as to the affiliation of the Seller Product with, or the sponsorship or endorsement of the Seller Product by, TPM, and [Valaurum] will not sell, ship, or otherwise dispose of any Product except in accordance with a Purchase Order hereunder.

*Id.* at 20. Section 20(i) contains an "Equitable Relief" clause wherein Valaurum agreed that legal remedies for any potential future breach of § 13(b) would be inadequate and that TPM would be entitled to equitable relief to remedy any such breach "without proof of any actual or special damages and without the need to post any bond." *Id.* at 26.

## E.  Valaurum's Alleged Breach of Contract

TPM asserts that, despite being aware of the allegedly infringing Depository Bills on July 30, it became aware only after signing the Sales Agreement that Valaurum was producing the Depository Bills in significant numbers and selling them to LSTA. ECF 24-1 ¶ 16. In October 2025, TPM "formally communicated its objections to Valaurum's manufacture" of the Depository Bills, both through counsel and in direct communications between Mr. Saab and Dr. Trexler. ECF 28 ¶ 11. Without conceding that the design of the Depository Bills infringed on TPM's trademarks, Valaurum offered to change the bills to mitigate TPM's concerns regarding possible source confusion. ECF 28-5 at 4-5. Mr. Saab rejected this offer and proposed that TPM merely license the marks to Valaurum for a fee consisting of two percent of sales. *Id.* at 4. Dr. Trexler rejected TPM's proposal. *Id.* at 3. On November 24, 2025, Mr. Saab wrote to Dr. Trexler that the parties "remain far apart on our view of the situation. . . . We are at an impasse. If you decide to proceed using our marks, we will need to let a judge decide." *Id.* at 1.

On January 23, 2026, TPM filed this lawsuit, *see* ECF 1, and on March 20, 2026, TPM filed its pending motion for preliminary injunction (ECF 24), seeking to enjoin Valaurum from

PAGE 7 – OPINION AND ORDER

manufacturing, supplying, marketing, distributing, or selling the Depository Bills or any other product bearing TPM's marks or confusingly similar images. After this lawsuit began, TPM had a small number of customer interactions that TPM contends show confusion amongst its consumers as to the origin of Valaurum's Depository Bills, including customer phone calls and social media posts. *See* ECF 24-1 ¶¶ 38-44 & Exs. 21-26 at 106-36.

## DISCUSSION

### A.  TPM's Motion for Preliminary Injunction

#### 1.  Standards

"A plaintiff seeking a preliminary injunction must demonstrate that she is likely to succeed on the merits, irreparable harm in the absence of preliminary relief, that the balance of equities tips in her favor, and that an injunction is in the public interest." *Bates v. Pakseresht*, 146 F.4th 772, 783 (9th Cir. 2025) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Alternatively, a preliminary injunction "may issue where 'serious questions going to the merits were raised and the balance of hardships tips sharply in plaintiff's favor' if the plaintiff 'also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest.'" *Planned Parenthood Great Nw., Haw., Alaska, Ind., Ky. v. Labrador*, 122 F.4th 825, 844 (9th Cir. 2024) (quoting *All. for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1135 (9th Cir. 2011)). In addition, "[d]ue to the urgency of obtaining a preliminary injunction at a point when there has been limited factual development, the rules of evidence do not apply strictly to preliminary injunction proceedings." *Herb Reed Enters., LLC v. Florida Entmt. Mgmt., Inc.*, 736 F.3d 1239, 1250 n.5 (9th Cir. 2013); *see also Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009).

The Ninth Circuit has "described the relationship between success on the merits and irreparable harm as a 'sliding scale in which the required degree of irreparable harm increases as

the probability of success decreases.'" *Glob. Horizons, Inc. v. U.S. Dep't of Lab.*, 510 F.3d 1054, 1058-59 (9th Cir. 2007) (quoting *Prudential Real Est. Affiliates, Inc. v. PPR Realty, Inc.*, 204 F.3d 867, 874 (9th Cir. 2000). "To reach this sliding scale analysis, however, a moving party must, at an 'irreducible minimum,' demonstrate some chance of success on the merits." *Id.* at 1059 (quoting *Arcamuzi v. Cont'l Air Lines, Inc.*, 819 F.2d 935, 937 (9th Cir. 1987)). When "a party has not shown any chance of success on the merits, no further determination of irreparable harm or balancing of hardships is necessary." *Id.*

To succeed on the first factor, "'at a minimum,' a petitioner must show that there is a 'substantial case for relief on the merits.' The standard does not require the petitioner to show that 'it is more likely than not that [it] will win on the merits.'" *Lair v. Bullock*, 697 F.3d 1200, 1204 (9th Cir. 2012) (quoting *Leiva-Perez v. Holder*, 640 F.3d 962, 966-68 (9th Cir. 2011)). The petitioner must, however, make a "strong showing" that they are likely to be successful. *Nken v. Holder*, 556 U.S. 418, 426 (2009) (citing *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)). As discussed below, because TPM has not shown that it is likely to succeed on the merits of either its Lanham Act claim or its breach of contract claim, the Court denies TPM's motion for preliminary injunction.[5]

### 2. TPM's Lanham Act Claim

The Lanham Act forbids the following:

> [U]se in commerce [of] any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive[.]

---

[5] TPM has not asserted that the alternative "serious questions" test supports its motion for preliminary injunction. Accordingly, the Court does not address this alternative test.

PAGE 9 – OPINION AND ORDER

15 U.S.C. § 1114(1)(a). To prevail on its Lanham Act claim, TPM must establish both that (1) it has a valid, protectable trademark and that (2) Valaurum's use of that mark is likely to cause confusion. *Applied Info. Scis. Corp. v. eBAY, Inc.*, 511 F.3d 966, 969 (9th Cir. 2007); *see also Bobosky v. Adidas AG*, 2010 WL 4853295, at *12 (D. Or. Oct. 8, 2010).

### a. Validity

Registration on the Principal Register is *prima facie* evidence that a mark is valid, that the registrant owns the mark, and that the registrant has an exclusive right to use the mark. 15 U.S.C. § 1115(a); *Tie Tech, Inc. v. Kinedyne Corp.*, 296 F.3d 778, 782-83 (9th Cir. 2002). If a mark has become incontestable under 15 U.S.C. § 1065, then "the registration shall be conclusive evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce," subject only to a list of nine defenses enumerated in the Lanham Act. 15 U.S.C. § 1115(b).

As discussed above, TPM has two Silhouette Marks on the USPTO's Principal Register, and both have achieved incontestable status. Thus, TPM has produced conclusive evidence for these two marks of both validity and ownership. Valaurum, however, argues that TPM was only able to obtain registration of these two marks on the USPTO's Principal Register "after TPM overcame refusals for geographic descriptiveness and ornamentality by claiming acquired distinctiveness through 'substantially exclusive and continuous use.'" ECF 27 at 11 (quoting ECF 29-13 at 1; ECF 29-14 at 1). Because Valaurum is a licensee of TPM's marks, Valaurum is estopped from alleging that those marks are invalid. *See Pac. Supply Co-op v. Farmers Union Cent. Exch. Inc.*, 318 F.2d 894, 908 (9th Cir. 1963) (discussing the "long settled principle of law that a licensee . . . . of a trademark or trade name may not set up any adverse claim in it as against its licensor."). Thus, TPM's two marks on the Principal Register are presumed valid.

PAGE 10 – OPINION AND ORDER

TPM also registered four other marks on the Supplemental Register. The presumption of validity does not apply to the four marks on the Supplemental Register. *See* 15 U.S.C. § 1094 ("[R]egistrations on the supplemental register shall not be subject to or receive the advantages of" § 1115); *Lyden v. adidas America, Inc.*, 2015 WL 566564, at *1 (D. Or. Feb. 10, 2015) ("[U]nlike registration on the Principal Register, registration on the Supplemental Register does not constitute *prima facie* evidence of the validity of a trademark") (emphasis added). In the absence of such a presumption, to succeed on its statutory claim, TPM has the burden to provide some evidence to establish that its marks are valid and protectable. *See, e.g., Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*, 419 F.3d 925, 927 (9th Cir. 2005).[6] TPM has not made any meaningful argument in either its motion for preliminary injunction or its reply showing the validity of TPM's Supplemental Register Marks beyond the fact that they are entered on the Supplemental Register. Thus, with respect to these four marks, TPM has failed, at least at this stage of the lawsuit, to establish the first element of a Lanham Act violation.

The Court finds that, for the purposes of TPM's motion for preliminary injunction, TPM has shown that its two marks on the Principal Register are valid but has not established validity for the four marks on the Supplemental Register. Recognizing, however, that the record also does not establish that the Supplemental marks are invalid, the Court continues its statutory analysis with respect to all six marks.

---

[6] "When a trademark is registered on the Supplemental Register, it may still receive protection if it is a descriptive mark that has acquired a secondary meaning." *Schoene v. Christensen*, 2023 WL 5128424, at *2 (D. Or. Aug. 10, 2023). A descriptive mark obtains secondary meaning when there is a "mental association by a substantial segment of consumers and potential consumers between the alleged mark and a single source of the product." *Levi Strauss & Co. v. Blue Bell*, 778 F.2d 1352, 1354 (9th Cir. 1985) (en banc). Secondary meaning is a question of fact, *see id.* at 1355, and can be established by a variety of evidence, *see Filipino Yellow Pages, Inc. v. Asian J. Publications, Inc.*, 198 F.3d 1143, 1151 (9th Cir. 1999).

### b. Confusion

TPM asserts two primary arguments regarding confusion, neither of which the Court finds persuasive. First, TPM argues that Valaurum's Depository Bills are "counterfeits" of TPM's registered marks. ECF 24 at 19-23. Second, TPM contends that, even if the Depository Bills are not counterfeits, they still infringe on TPM's marks under the principles explained in *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir. 1979). The Court addresses both arguments.

### i. Counterfeit Analysis

"A 'counterfeit' is a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127. A party's conduct would constitute counterfeiting only if: (1) the party intentionally used a counterfeit mark in commerce; (2) knowing the mark was counterfeit; (3) in connection with the sale, offering for sale, or distribution of goods; and (4) its use was likely to confuse or deceive. *State of Idaho Potato Comm'n v. G & T Terminal Packaging, Inc.*, 425 F.3d 708, 721 (9th Cir. 2005).

TPM argues that, when an infringement involves counterfeit marks, there is a presumption of likelihood of confusion. ECF 24 at 21. In support of this proposition, TPM cites *GS Holistic, LLC v. Bubbles Smoke Shop*, 2023 WL 6787773, at *5 (C.D. Cal. Sept. 5, 2023), and *Microsoft Corp. v. Buy More, Inc.*, 703 Fed. Appx. 476, 479 (9th Cir. 2017) (unpublished). Both cases cite back to *Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*, 658 F.3d 936, 945 (9th Cir. 2011). The Ninth Circuit in that case held that such a presumption only attaches to the use of counterfeit marks when that use is coupled with "*intent* to cause confusion." *Louis Vuitton*, 658 F.3d at 945 (emphasis added). *But see Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1056 (9th Cir. 1999) ("In light of the virtual identity of marks, if they were used with identical products or services likelihood of confusion would follow as a matter of course.").

PAGE 12 – OPINION AND ORDER

Here, there is no persuasive evidence that Valaurum had any intent to cause confusion.[7] Moreover, as explained below, the way in which Valaurum has used the images of Texas is not likely to be confusing. Thus, the Court does not presume a likelihood of confusion.

The Texas imagery that Valaurum uses on its Depository Bills is not identical to or substantially indistinguishable from TPM's marks. The Court will discuss first the Silhouette Mark and then the Supplemental Marks.

TPM asserts that the Silhouette Mark appears twice on the back of each of the Depository Bills, but the Court finds that neither depiction of the state of Texas was placed on the bills with an intent to cause confusion. First, the outline of the state of Texas appears as part of the service mark of the Texas Bullion Depository.[8] Valaurum printed this image on the notes because they are being produced for the Texas Bullion Depository. The fact that the outline is part of the Texas Bullion Depository's mark makes it distinguishable from the Silhouette Marks. Thus, this example is not a "counterfeit" of the Silhouette Mark, and TPM's counterfeit claim with respect to this example fails at step one of the analysis described in *Idaho Potato Commission*.

Second, on the left side of the back of all three notes, behind the Lone Star emblem and the Texas Bullion Depository mark, is the Echo Texas design, a faint depiction of the state of Texas, formed by concentric lines to create an echo effect. This example, too, is distinguishable from TPM's Silhouette Mark because the Echo Texas design is not a silhouette. A silhouette is an "outline of a body viewed as circumscribing a mass," usually "sketched in outline and solidly

---

[7] The Court further discusses Valaurum's intent below in its application of the *Sleekcraft* factors.

[8] The Texas Bullion Depository service mark is itself a valid trademark entered on the Principal Register. In this instance, the outline is set into a small circle, directly underneath the words "Texas Bullion Depository.gov."

PAGE 13 – OPINION AND ORDER

colored in." *Silhouette*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/silhouette (last visited Apr. 17, 2026). TPM's Silhouette Mark is, in keeping with this definition, generally a solid or outlined depiction of the state of Texas. In contrast, the Echo Texas design is distinctively patterned. Moreover, TPM has provided no example of any version of its Silhouette Mark that contains any sort of decoration or design work with which the Echo Texas pattern might be confused. Thus, the Court finds that the two designs are distinguishable. Thus, this example also fails at step one of *Idaho Potato Commission*.

Only the imagery on Valaurum's 20-centigram contain images of the Texas State Capitol exterior and rotunda. The Texas State Capitol Marks, as described previously, both include substantial portions of the façade of the building in addition to the entire dome. The images appear to be from the perspective of someone standing on the street outside the building. One of the two Marks also includes a statue of a cowboy and some foliage in the foreground. Conversely, the image of the Texas State Capitol on the 20-centigram note includes only the dome. It does not include any portion of the building's façade, statues, or foliage. Moreover, the image is from a perspective that is level with, and apparently much closer to, the dome. As a result, the image on the note includes much more detail than is visible in TPM's Marks. Thus, the Court finds that the image of the Texas State Capitol dome on the 20-centigram note is neither identical to nor substantially indistinguishable from either of TPM's Marks depicting the Texas State Capitol.

The Rotunda Mark is an orthogonal view of the interior of the Texas State Capitol rotunda. The Mark includes the entire interior of the rotunda. The image of the interior of the rotunda on the 20-centigram note includes only a portion of the interior of the rotunda. Like the image of the Texas State Capitol dome, the image of the interior of the rotunda is zoomed in and

PAGE 14 – OPINION AND ORDER

reflects more detail than is visible in TPM's Mark. The similarities between the image on the note and TPM's Mark are stronger with respect to the rotunda than with respect to the dome; however, they still do not rise to the level of being identical or substantially indistinguishable.

Moreover, to the extent that any imagery on Valaurum's notes may be confusingly similar to the Silhouette or Supplemental Register Marks, that confusion would be easily dispelled by the clear, obvious marks of the Texas Bullion Depository, laid out in large, all capital letters on both sides of the notes. Thus, even if the Court were to look beyond the first step of the *Idaho Potato Commission* analysis, TPM's counterfeit claim would still fail at step four because they are unlikely to cause any confusion or deception as to their origin. As a result, TPM has failed to show a likelihood of success on its "counterfeit" trademark claim.

### ii. *Sleekcraft* Analysis

The Court next considers whether Valaurum's Depository Bills are likely to cause confusion under the standard trademark infringement analysis. In conducting that analysis, courts in the Ninth Circuit employ the test laid out in *Sleekcraft*. That case lists eight non-exclusive factors that are relevant to the question of whether confusion between related goods is likely: (1) the strength of the mark; (2) the proximity of the goods; (3) the similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) the type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) the likelihood of expansion of the product lines. *Sleekcraft*, 599 F.2d at 348-49. The Ninth Circuit has cautioned against a rigid application of the *Sleekcraft* test, and indeed admonished both that "it is often possible to reach a conclusion . . . . after considering only a subset of factors" and that "non-listed variables may often be quite important" in the analysis. *Brookfield Communications*, 174 F.3d at 1054.

**(i)  Strength of the Marks**

Consumers are generally more likely to be confused by competing uses of a strong mark, and stronger marks are entitled to broader protection. "[The] 'strength' of the trademark is evaluated in terms of its conceptual strength and commercial strength." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1207 (9th Cir. 2000). "[A] mark's conceptual strength is proportional to the mark's distinctiveness." *M2 Software, Inc. v. Madacy Ent.*, 421 F.3d 1073, 1080 (9th Cir. 2005); *see also Combe Inc. v. Dr. August Wolff GmBH & Co. KG Arzeimittel*, 382 F. Supp. 3d 429, 452 n.14 (E.D. Va. 2019) ("Conceptual strength focuses on the [] uniqueness of the plaintiff's mark, whereas commercial strength hinges on whether consumers in fact associate the plaintiff's mark with a unique source."). "Marks are often classified in one of five categories of increasing distinctiveness: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful." *Kendall-Jackson Winery, Ltd. V. E. & J. Gallo Winery*, 150 F.3d 1042, 1047 (9th Cir. 1998). The latter three categories are inherently distinctive. *Id*. Thus, marks that fall into those categories are stronger marks than those that do not. *Id*. Descriptive marks may also be protectable upon a showing of acquired distinctiveness by establishing a secondary meaning in the marketplace. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768-69 (1992); *see also Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 991 (9th Cir. 2006). In measuring commercial strength, courts focus on a mark's "marketplace recognition value," or the degree to which consumers in fact associate the mark with a specific source. *Lahoti v. Vericheck, Inc.*, 636 F.3d 501, 508 (9th Cir. 2011).

The Silhouette Marks are conceptually weak but have moderate commercial strength. TPM points to the Silhouette Marks' entry on the Principal Register and the significant sales and

advertising involving the marks as evidence of their strength.[9] ECF 24 at 24-26. Entry on the

Principal Register can be an indicator that a mark is conceptually strong. In this case, however,

the Silhouette Marks did not gain entry on the Principal Register by virtue of their conceptual

distinctiveness. Rather, USPTO classified the Silhouette Marks merely as descriptive, a

relatively weak classification, before allowing their entry on the Principal Register because of the

strength they allegedly gained in the commercial market. USPTO's initial classification of the

Silhouette Marks had good reason. There is nothing graphically peculiar about an outline of the

state of Texas. In fact, the Court struggles to envision an image that would be more common

than outlines of such well-known geographic places. The Silhouette Marks, therefore, are

visually indistinctive and conceptually weak.

The Silhouette Marks do, however, enjoy moderate commercial strength. TPM supplies

several examples of the widespread use of its marks. "TPM Marks have been used in connection

with over 200,000 customer transactions nationwide, across all 50 states, generating total

revenues in excess of $4 billion." ECF 24 at 24 (citing ECF 24-1 ¶ 10).[10] In addition, several

major precious metal retailers have described the Silhouette Marks as "famous" or "iconic." *See*

ECF 24-1, Exs. 13, 15, at 83, 89. This widespread commercial success is likely due in part to the

substantial investment that TPM has made in developing, advertising, and packaging its products

containing the marks—$1.2 million between 2011 and 2015, with an additional $350,000 per

---

[9] TPM also argues that the incontestable status of the marks makes them particularly strong. ECF 24 at 24. However, "incontestable status . . . . does *not* require a finding that the mark is strong," *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1142 n.3 (9th Cir. 2002), because it bears on the mark's ownership, not its strength. *M2 Software Inc. v. M2 Commc'ns, L.L.C.*, 76 Fed. Appx. 123, 124 (9th Cir. 2003) (unpublished).

[10] TPM, however, provides only this information about its commercial activity pertaining to all its marks. It did not supply such information specifically for its Silhouette Marks. Thus, the information is of relatively lesser value than it might have been.

year since then. *Id*. ¶ 30. This commercial activity is not direct evidence of consumer recognition of the marks as associated with TPM. It is, however, reasonable to conclude that such activity would likely generate that recognition, and the substantial investment that TPM has made in the marks is entitled to some weight.

In response, Valaurum points out that the State of Texas has used the outline of the state of Texas on commemorative products and government materials for decades, and that the U.S. Mint placed the state's outline on the 2004 Texas State Quarter, of which more than 540 million coins were produced. ECF 25-1 at 4-6. Valaurum asserts that these facts "fatally undermine" TPM's claim of acquired distinctiveness through substantially exclusive and continuous use. ECF 27 at 11. But state commemorative materials, which Valaurum does not contend are precious metal products, and the 2004 Texas State Quarter, which was legal tender, are products of a different kind than those on which TPM places the Silhouette Marks. TPM's claim of acquired distinctiveness was based on substantially exclusive and continuous use in the precious metals market, not exclusive and continuous use across all markets. Thus, the Court does not find that the use of the outline of the state in non-precious metals products materially undermines the Silhouette Marks' commercial strength.

The strength of the Supplemental Register Marks is moderately weaker than that of the Silhouette Marks. The same analysis applies to the Supplemental Register Marks, except that the Supplemental Register Marks lack even the indication of the possibility of conceptual strength that registration on the Principal Register might furnish. All things considered, the first *Sleekcraft* factor is neutral as to the Silhouette Mark, and it weighs marginally against TPM as to the Supplemental Register Marks.

PAGE 18 – OPINION AND ORDER

### (ii) Proximity of the Goods

The Depository Bills and many of TPM's products bearing the contested marks are substantially proximate because they are the same type of product. Goods are proximate if they are "similar in use and function." *Sleekcraft*, 599 F.2d at 350. Valaurum's Depository Bills are gold notes. TPM sells gold notes bearing the contested marks. The two products are identical in use and function. Thus, the second *Sleekcraft* factor favors TPM.

### (iii) Similarity of the Marks

The contested marks and the images on the Depository Bills are dissimilar. As discussed above in the section analyzing TPM's counterfeit claim, the Texas Bullion Depository mark is easily distinguishable from the Silhouette Mark. Additionally, the Echo Texas design is distinguishable because it is not a silhouette, but rather a decorative image that includes patterns absent from the Silhouette Mark (indeed, patterns that, if included in the Silhouette Mark would make it something other than a silhouette). Finally, there are key differences between Valaurum's imagery depicting the Texas State Capitol and Rotunda on its 20-centigram note and the imagery covered by TPM's Supplemental Register Marks. The third *Sleekcraft* factor favors Valaurum.

### (iv) Evidence of Actual Confusion

There is no reliable evidence showing actual confusion. In an attempt to show that the Depository Bills have actually been confused with TPM products, TPM produces transcripts from five customer calls and screenshots of social media posts from possible customers. *See* ECF 24-1 ¶¶ 38-43; Exs. 21-26, at 106-136. This evidence invites as many questions as it answers. Two of the calls appear to indicate that those two customers erroneously believed TPM to be the producer of the Depository Bills. *Id*., Exs. 21-22, at 106-112. This point favors TPM.

PAGE 19 – OPINION AND ORDER

TPM states that the other three calls occurred when customers contacted TPM believing they had reached the Texas Bullion Depository, blaming the "Counterfeit Products" for the mistake. *Id*. ¶ 40. But these calls do not contain any mention of Depository Bills. *Id*., Ex. 23, at 116, 122-124, 126-27. Rather, these customers contacted TPM about an entirely different Texas Bullion Depository product. *Id*. These calls are about coins which, if one customer's description of them is correct, feature "the state of Texas" on the front side and a "wreath" on the back side. *Id*. at 116. These coins are not the subject of this lawsuit. Neither the content of these calls nor any detail about the coins show that the *Depository Bills* caused any customer confusion. Thus, these calls are irrelevant.

The social media posts do not alleviate the Court's skepticism. Nowhere in the posts do customers attribute the Depository Bills to TPM. *See id*., Exs. 24-26, at 129-136. In fact, multiple times, customers correctly distinguish between the Depository Bills and TPM products. For example, one user in the "Goldback Traders" Facebook community, discussing Valaurum's 5-centigram note, posted:

> These were made in conjunction with [t]he official state of Texas depository in Leander along with silver and gold coins. Unlike the DFW Goldback that was made in partnership with Texas [P]recious [M]etals out of Shiner, T[X], these are supposedly the official state notes.

*Id*., Ex. 24, at 131. Another user chimed in, stating that the note was "not a Goldback" but "Texas's independent attempt at sound money." *Id*., Ex. 25, at 134. Another stated that the "Texas depository is who commissioned them. Valaurum is the mint." *Id*., Ex. 26, at 136. Considering the full social media discussion about the note, TPM's characterization of the posts—that "users have posted images of Counterfeit Products without distinguishing them from authentic Goldbacks", *id*. ¶ 41—is incomplete.

PAGE 20 – OPINION AND ORDER

Further, courts often view with skepticism evidence of actual confusion from social media in part because social media posts typically lack information verifying user intent and existence and because of the potential for user bias. *See, e.g.*, *Nordstrom, Inc. v. NoMoreRack Retail Grp., Inc.*, 2013 WL 1196948, at *6 (W.D. Wash. Mar. 25, 2013) ("[I]solated instances of confusion, particularly those cloaked by anonymity on the Internet, do not rise to the level of actual confusion on a purchasing decision"); *Echo Drain v. Newsted*, 307 F. Supp. 2d 1116, 1126 (C.D. Cal. 2003) (finding that "[a] few unauthenticated e-mails and webpostings standing alone are not sufficient evidence of actual confusion," especially when those webpostings indicate that the buying public can distinguish the trademarked product from the allegedly infringing product); *Drake Univ. v. Des Moines Area Cmty. Coll. Found.*, 2024 WL 5440859, at *16 (S.D. Iowa Nov. 22, 2024) (rejecting social media posts as evidence of actual confusion because the posts "[did] not necessarily reflect an accurate sampling of the public or potential customers" and because of the tendency for social media users to be biased by exposure to other social media comments).

At best, TPM's exhibits show that, out of "200,000 customer transactions nationwide, across all 50 states, generating total revenues in excess of $4 billion," *id*. ¶ 10, two potential customers might have confused the Depository Bills with TPM products. "[C]ourts have often discounted [evidence of actual confusion] because it was unclear or insubstantial." *Sleekcraft*, 599 F.2d at 352 (citing *Carter-Wallace, Inc. v. Procter & Gamble Co.*, 434 F.2d 794, 800 (9th Cir. 1970) and *Norm Thompson Outfitters, Inc. v. Gen. Motors Corp.*, 448 F.2d 1293, 1295 (9th Cir. 1971)). The evidence here is insubstantial.

### (v) Marketing Channels Used

The Depository Bills are sold in the same or similar marketing channels as TPM products. For example, customers may purchase both the Depository Bills and TPM products

PAGE 21 – OPINION AND ORDER

online from popular precious metal retailers like APMEX and Finest Known. ECF 24-1 ¶¶ 46-47, Exs. 27-28, at 137-148. Moreover, depending on the search terms a customer uses to peruse the online catalogues of both retailers, they may find the Depository Bills side by side with TPM products, making them more difficult to distinguish. *Id*. "Convergent marketing channels increase the likelihood of confusion." *Off. Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1393 (9th Cir. 1993). Converging market channels undoubtedly exist here. Thus, the fifth *Sleekcraft* factor favors TPM.

### (vi) Type of Goods and Consumer Care

There is little evidence showing the degree of care exercised by customers in the gold note market, so the Court grants this factor little weight. The evidence that does exist suggests that the average purchaser in this market exercises a moderate to high degree of care.

Likelihood of confusion is evaluated from the perspective of a reasonably prudent consumer. *Brookfield*, 174 F.3d at 1060. Such a customer is expected to be more discerning when purchasing expensive items or when the products being sold are marketed primarily to expert buyers. *Id.* (citing *Off. Airline Guides*, 6 F.3d at 1393 and *Accuride Int'l, Inc. v. Accuride Corp.*, 871 F.2d 1531, 1537 (9th Cir. 1989)). Here, neither the Depository Bills nor comparable TPM products are expensive. Importantly, though, TPM states that the products are "marketed both to investors and collectors," as is the case with many precious metal products. ECF 24-1 ¶ 6. In other words, these are products "targeted at particular and discerning consumers" who, almost by definition, are repeat and experienced buyers likely to carefully consider their purchases. *Reeves v. General Nutrition Ctrs., Inc.*, 2012 WL 13018362, at *7 (C.D. Cal. Apr. 2, 2012). Moreover, the social media posts that TPM attached as exhibits to their Motion show a customer base that is fairly sophisticated, with users carrying on detailed conversations about the worth, validity, and source of Valaurum's 5-centigram note. ECF 24-1, Exs. 24-26, at 129-36.

Although the Court grants these posts little weight on their own for the reasons discussed above, together with TPM's own characterization of the market and their customer base, they confirm the Court's finding that the market at issue is a discerning one. The sixth *Sleekcraft* factor favors Valaurum.

### (vii)    Defendant's Intent

There is no indication that Valaurum designed its Depository Bills with the intent of "deriving benefit from the reputation of" TPM. *See First Brands Corp. v. Fred Meyer, Inc.*, 809 F.2d 1378, 1385 (9th Cir. 1987); *see also Kern v. Mindsource, Inc.*, 2000 WL 692199, at *3 (9th Cir. May 30, 2000) (quoting *W.W.W. Pharmaceutical Co. v. Gillette Co.*, 984 F.2d 567, 575 (2d Cir. 1993)) ("[The intent] factor considers 'whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product.'"). "When an alleged infringer knowingly adopts a mark similar to another's, courts will presume an intent to deceive the public." *Off. Airline Guides*, 6 F.3d at 1394. Here, it is true that the Depository Bills feature depictions of the state of Texas, the Texas State Capitol, and the Capitol Rotunda, which is an important similarity. But, as discussed above, the marks also have important differences. Moreover, communications from Dr. Trexler indicate that Valaurum believed its designs "could create no meaningful source confusion," which makes it difficult for the Court to find that Valaurum had a subjective intent to deceive the public. ECF 28-5 at 5. In the absence of such intent, the Court finds that the seventh *Sleekcraft* factor favors Valaurum.

### (viii)    Likelihood of Expansion

As discussed above, the two companies already operate in the same market and compete against each other for customers. Although there is little in the record to indicate that either company seeks to expand, the purpose of the eighth *Sleekcraft* factor is to account for the

PAGE 23 – OPINION AND ORDER

possibility that two companies not currently in direct competition or using the same market channels may one day converge. Because that convergence existed from the beginning of this case, the eighth *Sleekcraft* factor favors TPM.

Fundamentally, the factors supporting TPM all reflect the reality that Valaurum's Depository Bills and TPM's products compete in the same market, for the same customers, using similar channels. The question, then, is whether the customers in that market are likely to be confused by the imagery on Valaurum's Depository Bills when choosing between the products of the two companies. In answering that question, the Court finds the third *Sleekcraft* factor to be most important. Put simply, there are substantial differences between TPM's marks and the imagery on the Depository Bills. A reasonably prudent customer would not confuse the two, especially because the Depository Bills are distinctively marked as originating from the Texas Bullion Depository. As a result, TPM has not shown a likelihood of success on its trademark claim under the factors described in *Sleekcraft*.

### 3. TPM's Contract Claim

"To state a claim for breach of contract, plaintiff must allege the existence of a contract, 'its relevant terms, plaintiff's full performance and lack of breach and defendant's breach resulting in damage to plaintiff.'" *Slover v. Or. State Bd. of Clinical Soc. Workers*, 144 Or. App. 565, 570 (1996) (quoting *Fleming v. Kids & Kin Head Start*, 71 Or. App. 718, 721 (1985)); *see also Kornbrodt v. Equitable Trust Co.*, 137 Or. 386, 392 (1931) (holding that before a breach of contract action will lie, "it must appear from the complaint that there was a valid and enforceable contract in existence between the parties and that the defendant has breached the contract.").

There is no dispute in this case as to the existence of the contract, its relevant terms, or TPM's performance. The primary dispute is whether Valaurum breached the Sales Agreement,

PAGE 24 – OPINION AND ORDER

particularly § 13(b). The key provision of § 13(b) holds that Valaurum may not "design, develop, manufacture, market, distribute, or sell any product . . . . that displays, includes, or incorporates any mark or symbol *that is identical to, or confusingly similar to* any TPM Trademark" under a broad set of circumstances that cover most if not all uses which might confuse consumers or otherwise "constitute use of a TPM Trademark." ECF 24-1, Ex. 2, at 20 (emphasis added). The Court will address whether Valaurum breached the contract with respect to each mark.

### a.  Silhouette Marks

As the Court has already discussed, the images of the state of Texas on Valaurum's Depository Bills, including both the Texas Bullion Depository.gov mark and the Echo Texas design, are readily distinguishable from TPM's Silhouette Marks. This means that the images on Valaurum's Depository Bills are not identical to nor confusingly similar to the Silhouette Marks. Thus, they do not represent a violation of § 13(b) of the Sales Agreement.

### b.  Supplemental Register Marks

Section 13(b) of the Sales Agreement also covers the four marks that TPM has entered on the Supplemental Register. The relative weakness of these marks from a statutory perspective does not matter in the context of TPM's breach of contract claim. This is because Valaurum agreed, as part of the contract, that the prohibitions of § 13(b) applied equally to all of the trademark registrations included in Exhibit C of the Sales Agreement. ECF 24-1, Ex. 2, at 20, 30. Exhibit C includes the Texas State Capitol Marks and the Rotunda Mark. Valaurum includes images of the Texas State Capitol dome and the interior of the Capitol rotunda only on the front side of its 20-centigram note.[11] As described in the Court's earlier analysis of TPM's counterfeit

---

[11] Neither the 5-centigram note nor the 100-centigram note contain any imagery accused of infringing on the Texas State Capitol Marks or the Rotunda Mark.

claim, however, there are important differences between those images and the Supplemental Register Marks such that the Court does not find them to be identical to nor confusingly similar to each other.

Considering those important differences, TPM has not shown that the Depository Bills are likely to violate the terms of the Sales Agreement, and thus it has not shown a likelihood of success on the merits of its breach of contract claim against Valaurum. "When . . . a party has not shown any chance of success on the merits, no further determination of irreparable harm or balancing of hardships is necessary." *Global Horizons, Inc. v. United States Dep't of Labor*, 510 F.3d 1054, 1058 (9th Cir. 2007) ("To reach this sliding scale analysis, . . . a moving party must, at an 'irreducible minimum,' demonstrate some chance of success on the merits."). The Court therefore does not reach the remaining *Winter* factors.

## B.  TPM's Motion to Amend

Rule 15(a)(2) of the Federal Rules of Civil Procedure provides that the "court should freely give leave [to amend a pleading] when justice so requires." A district court should apply Rule 15's "policy of favoring amendments . . . with extreme liberality." *Price v. Kramer*, 200 F.3d 1237, 1250 (9th Cir. 2000) (quotation marks omitted). The purpose of the rule "is 'to facilitate decision on the merits, rather than on the pleadings or technicalities.'" *Novak v. United States*, 795 F.3d 1012, 1020 (9th Cir. 2015) (quoting *Chudacoff v. Univ. Med. Ctr.*, 649 F.3d 1143, 1152 (9th Cir. 2011)). The Court grants Plaintiff's Motion for Leave to File an Amended Complaint (ECF 57).

## C.  TPM's Motion to Dismiss Valaurum's Affirmative Defenses and Counterclaims

"It is well-established in our circuit that an 'amended complaint supersedes the original, the latter being treated as non-existent.'" *Ramirez v. Cnty. of San Bernardino*, 806 F.3d 1002, 1008 (9th Cir. 2015). Motions directed at a complaint that has been superseded should be denied

on grounds of mootness. *Id.*; *see also Singh v. Trump*, 2019 WL 2192127, at *2 (D. Or. May 21, 2019) ("Because Plaintiffs will file an amended complaint, Defendants' pending motion to dismiss the original complaint is now moot."); *United States v. Shofner Iron & Steel Works*, 71 F. Supp. 161, 162 (D. Or. 1947) ("As the amended complaint supersedes the original complaint no motion of any kind can now be addressed to the original complaint as it performs no function in the action."). Because the Court is granting TPM's motion to amend, TPM's amended complaint will supersede its original complaint. This renders moot Valaurum's answer, affirmative defenses, and counterclaims to the original complaint, as well as TPM's motion to dismiss certain of those affirmative defenses and counterclaims. Thus, the Court denies as moot TPM's motion to dismiss (ECF 30).

## D.  Valaurum's Motion to Stay

Valaurum asks that this lawsuit be stayed pending final resolution of two lawsuits now in federal court in Texas. ECF 31 at 2. The first action was filed by the State of Texas, the Texas Bullion Depository, and the Acting Texas Comptroller of Public Accounts against TPM in the Northern District of Texas, Case No. 7:26-cv-21-O, seeking cancellation of the marks that are the subject of the action here, as well as a declaration of non-infringement as to the Valaurum products at issue here. The second action was filed by TPM against the State of Texas in the Western District of Texas, Case No. 1:26-cv-513-DAE, alleging counterfeiting and trademark infringement based on the same Valaurum products at issue here.

District courts have broad authority to stay proceedings as part of their inherent power to control their own dockets in order to facilitate "economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). In considering whether to grant a stay, a court should consider the following:

PAGE 27 – OPINION AND ORDER

> [T]he possible damage which may result from the granting of a stay, the hardship or inequity which a party may suffer in being required to go forward, and the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay.

*Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1110 (9th Cir. 2005) (quoting *CMAX, Inc. v. Hall*, 300 F.2d 265 (9th Cir. 1962)).

Valaurum correctly asserts that there is substantial overlap in the issues between the instant case and the Texas actions, arguing that the resolution of the Texas cases may eliminate or substantially narrow this case. Valaurum further states that, at a minimum, "the Texas Actions will clarify whether TPM has enforceable rights in the imagery that anchors this suit and whether bills bearing Texas iconography infringe any TPM rights." ECF 31 at 8. Thus, Valaurum contends, continuing forward with this case would be inefficient, asking this Court to "adjudicate issues that directly impact the State of Texas *without the State of Texas having any say in the matter*," and require Valaurum to pay for litigation that ultimately may be unnecessary. *Id*. at 8-9, 11-12.

TPM responds that Valaurum has not shown a clear case of hardship. TPM also argues that a stay would compound the ongoing hardship that TPM already is facing caused by Valaurum's continuing alleged trademark infringement and that TPM's contract claim here is distinct from the trademark claims that overlap with the subject matter of the Texas actions. *See* ECF 42.

In considering the *Lockyer* factors, the Court begins with a finding that the potential harm from granting a stay is likely to be low. As the Court has discussed earlier in this Opinion and Order, there appears to be little likelihood of confusion between TPM and Valaurum's products, and thus minimal likelihood of any harm from the alleged trademark infringement. The Court, however, is mindful that in any litigation, the result of a preliminary injunction decision may not

PAGE 28 – OPINION AND ORDER

match the result after trial. The record at the preliminary injunction stage is more limited. Between that stage and trial, new evidence may emerge and new arguments may be developed. Put simply, although the record now before the Court shows that a stay likely would lead to little damage to TPM because they are unlikely to succeed on the merits of their claims, that conclusion may change at trial as new facts or arguments develop. Further, both Texas actions are in early stages and present complex questions of law. "A stay should not be granted unless it appears likely the other proceedings will be concluded within a reasonable time in relation to the urgency of the claims presented to the court." *Leyva v. Certified Grocers of Cal., Ltd.*, 593 F.2d 857, 864 (9th Cir. 1979). With no reason to believe that the Texas actions will conclude within a reasonable time, even relative to the minimal harm that the Court expects TPM to suffer, the first *Lockyer* factor weighs against a stay.

The hardship to Valaurum associated with going forward comes down to the fact that they may have to defend an action that the Texas actions ultimately render unnecessary. But "being required to defend a suit, without more, does not constitute a 'clear case of hardship or inequity' within the meaning of *Landis*." *Lockyer*, 398 F.3d at 1112. Valaurum cites to *Schumann v. Amazon Inc.*, 2021 WL 5069178, at *3 (D. Or. July 19, 2021), for the proposition that "more" includes "subjecting a litigant to the hardship and inequity of unnecessary and duplicative litigation." But Valaurum is not a party to the Texas litigation, except insofar as it has affirmatively moved to intervene there, and so any hardship it suffers stemming from duplicative litigation is hardship it sought out. The second *Lockyer* factor weighs against a stay.

The third *Lockyer* factor, "orderly course of justice," favors a stay. The actions in Texas stand to substantially narrow or clarify, and perhaps eliminate entirely, the claims in the instant case. Indeed, some of the issues in the Texas cases are identical to the issues before this Court.

PAGE 29 – OPINION AND ORDER

Ultimately, however, the Court finds most persuasive the likelihood that the Texas actions may take a substantial amount of time to reach final resolution, leaving important issues bearing on TPM and Valaurum's rights uncertain. Accordingly, the Court denies Valaurum's motion to stay.

## CONCLUSION

The Court DENIES TPM's motion for preliminary injunction (ECF 24), GRANTS TPM's motion for leave to file an amended complaint (ECF 57), DENIES as moot TPM's motion to dismiss Valaurum's affirmative defenses and counterclaims (ECF 30), and DENIES Valaurum's motion to stay (ECF 31).

**IT IS SO ORDERED**.

DATED this 31st day of July, 2026.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge